**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

STATE OF ARIZONA; JANICE K.
BREWER, Governor of the State of
Arizona, in her official capacity,
          *Defendants-Appellants.*

No. 10-16645

D.C. No.
2:10-cv-01413-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
November 1, 2010—San Francisco, California

Filed April 11, 2011

Before: John T. Noonan, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Noonan;
Partial Concurrence and Partial Dissent by Judge Bea

UNITED STATES v. STATE OF ARIZONA          4809

**COUNSEL**

John J. Bouma, Robert A. Henry, Joseph G. Adams, Joseph
A. Kanefield, Office of Governor Janice K. Brewer, for

defendants-appellants State of Arizona, and Janice K. Brewer, Governor of the State of Arizona.

Edwin Kneedler, Deputy United States Solicitor General, Tony West, Assistant Attorney General, Dennis K. Burke, United States Attorney, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Thomas M. Bondy, Michael P. Abate, Daniel Tenny, Attorneys, Appellate Staff Civil Division, Department of Justice, for plaintiff-appellee United States of America.

**OPINION**

PAEZ, Circuit Judge:

In April 2010, in response to a serious problem of unauthorized immigration along the Arizona-Mexico border, the State of Arizona enacted its own immigration law enforcement policy. Support Our Law Enforcement and Safe Neighborhoods Act, as amended by H.B. 2162 ("S.B. 1070"), "make[s] attrition through enforcement the public policy of all state and local government agencies in Arizona." S.B. 1070 § 1. The provisions of S.B. 1070 are distinct from federal immigration laws. To achieve this policy of attrition, S.B. 1070 establishes a variety of immigration-related state offenses and defines the immigration-enforcement authority of Arizona's state and local law enforcement officers.

Before Arizona's new immigration law went into effect, the United States sued the State of Arizona in federal district court alleging that S.B. 1070 violated the Supremacy Clause on the grounds that it was preempted by the Immigration and Nationality Act ("INA"), and that it violated the Commerce Clause. Along with its complaint, the United States filed a motion for injunctive relief seeking to enjoin implementation of S.B. 1070 in its entirety until a final decision is made about

its constitutionality. Although the United States requested that the law be enjoined in its entirety, it specifically argued facial challenges to only six select provisions of the law. *United States v. Arizona*, 703 F. Supp. 2d 980, 992 (D. Ariz. 2010).

The district court granted the United States' motion for a preliminary injunction in part, enjoining enforcement of S.B. 1070 Sections 2(B), 3, 5(C), and 6, on the basis that federal law likely preempts these provisions. *Id.* at 1008. Arizona appealed the grant of injunctive relief, arguing that these four sections are not likely preempted; the United States did not cross-appeal the partial denial of injunctive relief. Thus, the United States' likelihood of success on its federal preemption argument against these four sections is the central issue this appeal presents.[1]

We have jurisdiction to review the district court's order under 28 U.S.C. § 1292(a)(1). We hold that the district court did not abuse its discretion by enjoining S.B. 1070 Sections 2(B), 3, 5(C), and 6. Therefore, we affirm the district court's preliminary injunction order enjoining these certain provisions of S.B. 1070.

## *Standard of Review*

We review the district court's grant of a preliminary injunction for abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). A preliminary injunction "should be reversed if the district court based 'its decision on an erroneous legal standard or on clearly erroneous findings of fact.' " *Stormans, Inc. v.*

---

[1] A party seeking a preliminary injunction has the burden to demonstrate that (1) it is likely to succeed on the merits of the claim, (2) it will suffer irreparable harm absent injunctive relief, and (3) that the balance of the equities and the public interest favor granting the injunction. *Winter v. Natural Res. Def. Council Inc.*, 129 S. Ct. 365, 374 (2008). Our analysis here begins and focuses on the critical issue of the United States' likelihood of success on the merits of its preemption claim.

4812          UNITED STATES v. STATE OF ARIZONA

*Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (*quoting FTC v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1211-12 (9th Cir. 2004)). We review de novo the district court's conclusions on issues of law, including "the district court's decision regarding preemption and its interpretation and construction of a federal statute." *Am. Trucking Ass'ns, Inc. v. Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

### *Discussion*

## I.   General Preemption Principles

**[1]** The federal preemption doctrine stems from the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the "fundamental principle of the Constitution [ ] that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Our analysis of a preemption claim

> [M]ust be guided by two cornerstones of [the Supreme Court's] pre-emption jurisprudence. First, the purpose of Congress is the ultimate touchstone in every pre-emption case. . . . Second, [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009) (internal quotation marks and citations omitted) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

**[2]** Even if Congress has not explicitly provided for preemption in a given statute, the Supreme Court "ha[s] found that state law must yield to a congressional Act in at least two

circumstances." *Crosby*, 530 U.S. at 372. First, "[w]hen Congress intends federal law to 'occupy the field,' state law in that area is preempted." *Id.* (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100 (1989)). Second, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Id.* Conflict preemption, in turn, has two forms: impossibility and obstacle preemption. *Id.* at 372-373. Impossibility preemption exists "where it is impossible for a private party to comply with both state and federal law." *Id.* Obstacle preemption exists "where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). To determine whether obstacle preemption exists, the Supreme Court has instructed that we employ our "judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.*[2]

We recently applied the facial challenge standard from *United States v. Salerno*, 481 U.S. 739 (1987), to a facial preemption case. *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 579-80 (9th Cir. 2008) (en banc). In *Sprint*, the appellant argued that a federal law "preclud[ing] state and local governments from enacting ordinances that prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service" facially preempted a San Diego ordinance that imposed specific requirements on applications for wireless facilities. *Id.* at 573-74. We explained in *Sprint* that "[t]he Supreme Court and this court have called into question the continuing validity of the Salerno rule in the context of First Amendment challenges. . . . In cases involving federal pre-

---

[2]The Supreme Court has recognized "that the categories of preemption are not "rigidly distinct." *Crosby*, 530 U.S. at 372 n.6 (quoting *English v. Gen. Elec., Co.,* 496 U.S. 72, 79 n.5 (1990)).

4814          UNITED STATES v. STATE OF ARIZONA

emption of a local statute, however, the rule applies with full force." *Id.* at 579, n.3.[3]

[3] Thus, under *Salerno*, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Sprint*, 543 F.3d at 579 (quoting *Salerno,* 481 U.S. at 745). We stress that the question before us is not, as Arizona has portrayed, whether state and local law enforcement officials can *apply* the statute in a constitutional way. Arizona's framing of the *Salerno* issue assumes that S.B. 1070 is not preempted on its face, and then points out allegedly permissible applications of it. This formulation misses the point: there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause.[4]

## II.   Section 2(B)[5]

---

[3]Although we use the *Salerno* standard in a preemption analysis, it is not entirely clear from relevant Supreme Court cases the extent to which the *Salerno* doctrine applies to a facial preemption challenge. *Crosby*, 530 U.S. 363, and *American Insurance Association v. Garamendi,* 539 U.S. 396 (2003) are both facial preemption cases decided after *Salerno* and—on this point—are the most analogous Supreme Court cases available to guide our review here. Neither case cites *Salerno* nor mentions its standard in the opinions, concurrences, or dissents. Indeed, the *only* Supreme Court preemption case that we have found which references the *Salerno* standard is *Anderson v. Edwards*, 514 U.S. 143 (1995), which we cited in *Sprint.* But *Edwards* does not cite *Salerno* in the *preemption* section of the opinion. Rather, the Court references *Salerno* in the section of the *Edwards* opinion holding that "the California Rule does not *violate* any of the three federal regulations on which the Court of Appeals relied." 514 U.S. at 155 (emphasis added). *Edwards* continues on, in another section, to hold that the California regulation at issue is also not preempted by federal law; this analysis includes no mention of the *Salerno* standard.

[4]Here, we conclude that the relevant provisions of S.B. 1070 facially conflict with Congressional intent as expressed in provisions of the INA. If that were not the case, as in *Sprint*, we would have next considered whether the statute could be applied in a constitutional manner.

[5]Section 2(B) of Arizona's law provides:

S.B. 1070 Section 2(B) provides, in the first sentence, that when officers have reasonable suspicion that someone they have lawfully stopped, detained, or arrested is an unauthorized immigrant, they "shall" make "a reasonable attempt . . . when practicable, to determine the immigration status" of the person. Ariz. Rev. Stat. Ann. § 11-1051(B) (2010). Section 2(B)'s second and third sentences provide that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released," and "[t]he person's immigration status shall be verified with the federal government." *Id.* The Section's fifth sentence states that a "person is presumed to not be an alien who is unlawfully present in the

---

> For any lawful stop, detention or arrest made by [an Arizona] law enforcement official or a law enforcement agency . . . in the enforcement of any other law or ordinance of a county, city or town [of] this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation. Any person who is arrested shall have the person's immigration status determined before the person is released. The person's immigration status shall be verified with the federal government pursuant to 8 United States Code section 1373(c) . . . A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer or agency any of the following:
>
> > 1. A valid Arizona driver license.
> >
> > 2. A valid Arizona nonoperating identification license.
> >
> > 3. A valid tribal enrollment card or other form of tribal identification.
> >
> > 4. If the entity requires proof of legal presence in the United States before issuance, any valid United States federal, state or local government issued identification.

Ariz. Rev. Stat. Ann. § 11-1051(B) (2010).

United States if the person provides" a form of identification included in a prescribed list.[6]

## A.  Interpretation of Section 2(B)

To review the district court's preliminary injunction of Section 2(B), we must first determine how the Section's sentences relate to each other. Arizona argues that Section 2(B) does not require its officers to determine the immigration status of every person who is arrested. Arizona maintains that the language in the second sentence, "[a]ny person who is arrested shall have the person's immigration status determined," should be read in conjunction with the first sentence requiring officers to make "a reasonable attempt . . . when practicable, to determine the immigration status" of a person they have stopped, detained, or arrested, *if there is reasonable suspicion* the person is an unauthorized immigrant. That is, Arizona argues that its officers are only required to verify the immigration status of an arrested person before release if reasonable suspicion exists that the person lacks proper documentation.

On its face, the text does not support Arizona's reading of Section 2(B). The second sentence is unambiguous: "*Any* person who is arrested *shall* have the person's immigration status *determined* before the person is released." Ariz. Rev. Stat. Ann. § 11-1051(B) (2010) (emphasis added). The all-encompassing "any person," the mandatory "shall," and the definite "determined," make this provision incompatible with the first sentence's qualified "reasonable attempt . . . when practicable," and qualified "reasonable suspicion."

---

[6]We have carefully considered the dissent and we respond to its arguments as appropriate. We do not, however, respond where the dissent has resorted to fairy tale quotes and other superfluous and distracting rhetoric. These devices make light of the seriousness of the issues before this court and distract from the legitimate judicial disagreements that separate the majority and dissent.

In addition, Arizona's reading creates irreconcilable confusion as to the meaning of the third and fifth sentences. The third sentence, which follows the requirement of determining status prior to an arrestee being released, provides that "[t]he person's immigration status shall be verified with the federal government." The fifth sentence enumerates several forms of identification that will provide a presumption that a person is lawfully documented. These two sentences must apply to different—and unrelated—status-checking requirements since one mandates contact with the federal government and a definite verification of status, while the other permits a mere unverified presumption of status, assuming the presumption is not rebutted by other facts. Arizona's reading would give law enforcement officers conflicting direction. That is, under Arizona's reading, if an officer arrests a person and reasonably suspects that the arrestee is undocumented, but the arrestee provides a valid Arizona driver's license, is the officer no longer bound by the third sentence's requirement that he or she "shall" verify the arrestee's status with the federal government?

**[4]** We agree with the district court that the reasonable suspicion requirement in the first sentence does not modify the plain meaning of the second sentence. Thus, Section 2(B) requires officers to verify—with the federal government—the immigration status of *all* arrestees before they are released, regardless of whether or not reasonable suspicion exists that the arrestee is an undocumented immigrant. Our interpretation gives effect to "arrest" in the first sentence and "arrest" in the second sentence. The first and second sentences apply to different points in the sequential process of effecting an arrest, and at some later point, releasing the arrestee. The mandate imposed in the first sentence applies at the initial stage of an encounter or arrest, which is evident by the fact that the status-checking requirement does not override an officer's need to attend to an ongoing and immediate situation: "a reasonable attempt shall be made, *when practicable*, to determine the immigration status of the person, except if the determina-

tion may hinder or obstruct an investigation." (emphasis added). The mandatory directive in the second sentence applies at the end of the process: an arrestee's immigration status "shall . . . [be] determined before the person is released."[7]

## B.   Preemption of Section 2(B)

As the Supreme Court recently instructed, every preemption analysis "must be guided by two cornerstones." *Wyeth*, 129 S. Ct. at 1194. The first is that "the purpose of Congress is the ultimate touchstone." *Id.* The second is that a presumption against preemption applies when "Congress has legislated . . . in a field which the States have traditionally occupied." *Id.* The states have not traditionally occupied the field of identifying immigration violations so we apply no presumption against preemption for Section 2(B).

We begin with "the purpose of Congress" by examining the text of 8 U.S.C. § 1357(g). In this section of the INA, titled "Performance of immigration officer functions by State officers and employees," Congress has instructed under what conditions state officials are permitted to assist the Executive in the enforcement of immigration laws. Congress has provided that the Attorney General "may enter into a written agreement with a State . . . pursuant to which an officer or employee of the State . . . who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or

---

[7]The dissent claims that Section 2(B) "merely requires Arizona officers to inquire into the immigration status of suspected" undocumented immigrants; that "simply informing federal authorities of the presence of an [undocumented immigrant]. . . represents the full extent of Section 2(B)'s limited scope." Dissent at 4873-74. Section 2(B) requires much more than mere inquires—it requires that people be detained until those inquiries are settled, and in the event of an arrest, the person may not be released until the arresting agency obtains verification of the person's immigration status. Detention, whether intended or not, is an unavoidable consequence of Section 2(B)'s mandate.

detention of aliens in the United States . . . may carry out such function." 8 U.S.C. § 1357(g)(1). Subsection (g)(3) provides that "[i]n performing a function under this subsection, an officer . . . of a State . . . shall be subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3). Subsection (g)(5) requires that the written agreement must specify "the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual." 8 U.S.C. § 1357(g)(5).

These provisions demonstrate that Congress intended for states to be involved in the enforcement of immigration laws under the Attorney General's close supervision. Not only must the Attorney General approve of each *individual* state officer, he or she must delineate which functions each individual officer is permitted to perform, as evidenced by the disjunctive "or" in subsection (g)(1)'s list of "investigation, apprehension, or detention," and by subsection (g)(5). An officer might be permitted to help with investigation, apprehension *and* detention; or, an officer might be permitted to help only with one or two of these functions. Subsection (g)(5) also evidences Congress' intent for the Attorney General to have the discretion to make a state officer's help with a certain function permissive or mandatory. In subsection (g)(3), Congress explicitly required that in enforcing federal immigration law, state and local officers "shall" be directed by the Attorney General. This mandate forecloses any argument that state or local officers can enforce federal immigration law as directed by a mandatory state law.

We note that in subsection (g)(10), Congress qualified its other § 1357(g) directives:

> Nothing in this subsection shall be construed to require an agreement . . . in order for any officer or employee of a State . . . (A) to communicate with the

4820          UNITED STATES v. STATE OF ARIZONA

Attorney General regarding the immigration status of any individual . . . or (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present.

8 U.S.C. § 1357(g)(10). Although this language, read alone, is broad, we must interpret Congress' intent in adopting subsection (g)(10) in light of the rest of § 1357(g). Giving subsection (g)(10) the breadth of its isolated meaning would completely nullify the rest of § 1357(g), which demonstrates that Congress intended for state officers to aid in federal immigration enforcement only under particular conditions, including the Attorney General's supervision. Subsection (g)(10) does not operate as a broad alternative grant of authority for state officers to systematically enforce the INA outside of the restrictions set forth in subsections (g)(1)-(9).

The inclusion of the word "removal" in subsection (g)(10)(B) supports our narrow interpretation of subsection (g)(10). Even state and local officers authorized under § 1357(g) to investigate, apprehend, or detain immigrants do not have the authority to remove immigrants; removal is exclusively the purview of the federal government. By including "removal" in § 1357(g)(10)(B), we do not believe that Congress intended to grant states the authority to remove immigrants. Therefore, the inclusion of "removal" in the list of ways that a state may "otherwise [ ] cooperate with the Attorney General," indicates that subsection (g)(10) does not permit states to opt out of subsections (g)(1)-(9) and systematically enforce the INA in a manner dictated by state law, rather than by the Attorney General. We therefore interpret subsection (g)(10)(B) to mean that when the Attorney General calls upon state and local law enforcement officers—or such officers are confronted with the necessity—to cooperate with federal immigration enforcement on an incidental and as needed basis, state and local officers are permitted to provide this cooperative help without the written agreements that are

required for *systematic* and *routine* cooperation.[8] Similarly, we interpret subsection (g)(10)(A) to mean that state officers can communicate with the Attorney General about immigration status information that they obtain or need in the performance of their regular state duties. But subsection (g)(10)(A) does not permit states to adopt laws dictating how and when state and local officers *must* communicate with the Attorney General regarding the immigration status of an individual. Subsection (g)(10) does not exist in a vacuum; Congress enacted it alongside subsections (g)(1)-(9) and we therefore interpret subsection (g)(10) as part of a whole, not as an isolated provision with a meaning that is unencumbered by the other constituent parts of § 1357(g).[9]

**[5]** In sum, 8 U.S.C. § 1357(g) demonstrates that Congress intended for state officers to systematically aid in immigration enforcement *only* under the close supervision of the Attorney

---

[8]In a footnote, the dissent constructs an imaginary scenario where officers in the Pima County Sheriff's Office are confused by our holding that they must have a § 1357(g) agreement to cooperate with federal officials in immigration enforcement on a systematic and routine basis. Dissent at 4866, n.9. We trust that law enforcement officers will make good faith efforts to comply with our interpretation of federal law and will carry out their duties accordingly.

[9]Our interpretation of subsection (g)(10) is also supported by 8 U.S.C. § 1103(a)(10), which states that "[i]n the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service." If subsection (g)(10) meant that state and local officers could routinely perform the functions of DHS officers outside the supervision of the Attorney General, there would be no need for Congress to give the Attorney General the ability, in § 1103(a)(10), to declare an "actual or imminent mass influx of aliens," and to authorize "any State or local law enforcement officer" to perform the functions of a DHS officer.

General—to whom Congress granted discretion in determining the precise conditions and direction of each state officer's assistance. We find it particularly significant for the purposes of the present case that this discretion includes the Attorney General's ability to make an individual officer's immigration-enforcement duties permissive or mandatory. 8 U.S.C. § 1357(g)(5). Section 2(B) sidesteps Congress' scheme for permitting the states to assist the federal government with immigration enforcement. Through Section 2(B), Arizona has enacted a mandatory and systematic scheme that conflicts with Congress' explicit requirement that in the "[p]erformance of immigration officer functions by State officers and employees," such officers "shall be subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3). Section 2(B) therefore interferes with Congress' scheme because Arizona has assumed a role in directing its officers how to enforce the INA. We are not aware of any INA provision demonstrating that Congress intended to permit states to usurp the Attorney General's role in directing state enforcement of federal immigration laws.

Arizona argues that in another INA provision, "Congress has expressed a clear intent to *encourage* the assistance from state and local law enforcement officers," citing 8 U.S.C. § 1373(c). Section 1373(c) creates an obligation, on the part of the Department of Homeland Security ("DHS"), to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual . . . for any purpose authorized by law."

We agree that § 1373(c) demonstrates that Congress contemplated state assistance in the identification of undocumented immigrants.[10] We add, however, that Congress

_____

[10]We also agree with the dissent that "Congress envisioned, intended, and encouraged inter-governmental cooperation between state and federal agencies, at least as to information regarding a person's immigration sta-

UNITED STATES v. STATE OF ARIZONA          4823

contemplated this assistance within the boundaries established in § 1357(g), not in a manner dictated by a state law that furthers a state immigration policy. Congress passed § 1373(c) at the same time that it added subsection (g) to § 1357. *See* Omnibus Consolidated Appropriations Act, 1997, Pub.L. 104-208, §§ 133, 642 (1996). Thus, Congress directed the appropriate federal agency to respond to state inquiries about immigration status at the same time that it authorized the Attorney General to enter into § 1357(g) agreements with states. Arizona and the dissent urge a very broad interpretation of § 1373(c): because DHS is obligated to respond to identity inquiries from state and local officers, they argue, Arizona must be permitted to direct its officers how and when to enforce federal immigration law in furtherance of the state's own immigration policy of attrition. This interpretation would result in one provision swallowing all ten subsections of § 1357(g), among other INA sections. Our task, however, is not to identify one INA provision and conclude that its text alone holds the answer to the question before us. Rather, we must determine how the many provisions of a vastly complex statutory scheme function together. Because our task is to interpret the meaning of many INA provisions as a whole, not § 1373(c) and § 1357(g)(10) at the expense of all others, we are not persuaded by the dissent's argument, which considers these provisions in stark isolation from the rest of the statute.[11]

---

tus." Dissent at 4879. We are convinced, however, that this cooperation is to occur on the federal government's terms, not on those mandated by Arizona. In light of the dissent's extensive discussion of the word "cooperate," we note what would seem to be fairly obvious: given that the United States has had to sue the State of Arizona to stop it from enforcing S.B. 1070, it is quite clear that Arizona is not "cooperating" with the federal government in any sense of the word. Arizona does not seek intergovernmental cooperation—it seeks to pursue its own policy of "attrition through enforcement." S.B. 1070 § 1.

[11]Arizona also cites 8 U.S.C. §§ 1373(a) and 1644 in support of its argument that "Congress has expressed a clear intent to *encourage* the assistance from state and local law enforcement officers." These sections are anti-sanctuary provisions. That the federal government prohibits States from *impeding* the enforcement of federal immigration laws does not constitute an invitation for states to affirmatively enforce immigration laws outside Congress' carefully constructed § 1357(g) system.

4824 UNITED STATES v. STATE OF ARIZONA

In addition to providing the Attorney General wide discretion in the contents of each § 1357(g) agreement with a state, Congress provided the Executive with a fair amount of discretion to determine how *federal* officers enforce immigration law. The majority of § 1357 grants powers to DHS officers and employees to be exercised within the confines of the Attorney General's regulations; this section contains few mandatory directives from Congress to the Attorney General or DHS. The Executive Associate Director for Management and Administration at U.S. Immigration and Customs Enforcement within DHS has explained the purpose of this Congressionally-granted discretion: "DHS exercises a large degree of discretion in determining how best to carry out its enforcement responsibilities" which "necessitates prioritization to ensure ICE expends resources most efficiently to advance the goals of protecting national security, protecting public safety, and securing the border."

**[6]** By imposing mandatory obligations on state and local officers, Arizona interferes with the federal government's authority to implement its priorities and strategies in law enforcement, turning Arizona officers into state-directed DHS agents. As a result, Section 2(B) interferes with Congress' delegation of discretion to the Executive branch in enforcing the INA. To assess the impact of this interference in our preemption analysis, we are guided by the Supreme Court's decisions in *Crosby,* 530 U.S. 363, and *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). *In Crosby*, where the Court found that a state law was preempted because it posed an obstacle to Congress' intent, the Court observed that "Congress clearly intended the federal Act to provide the President with flexible and effective authority," and that the state law's "unyielding application undermines the President's intended statutory authority." 530 U.S. at 374, 377. In *Buckman,* the Court found that state fraud-on-the-Food And Drug Administration claims conflicted with the relevant federal statute and were preempted, in part because "flexibility is a critical component of the statutory and regulatory framework" of the fed-

eral law, and the preempted state claims would have disrupted that flexibility. 531 U.S. at 349. The Court observed that "[t]his flexibility is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives." *Id.*

**[7]** In light of this guidance, Section 2(B)'s interference with Congressionally-granted Executive discretion weighs in favor of preemption. Section 2(B)'s 'unyielding" mandatory directives to Arizona law enforcement officers "undermine[ ] the President's intended statutory authority" to establish immigration enforcement priorities and strategies. *Crosby*, 530 U.S. at 377. Furthermore, "flexibility is a critical component of the statutory and regulatory framework under which the" Executive "pursues [the] difficult (and often competing) objectives," *Buckman*, 531 U.S. at 349, of—according to ICE —"advanc[ing] the goals of protecting national security, protecting public safety, and securing the border." Through Section 2(B), Arizona has attempted to hijack a discretionary role that Congress delegated to the Executive.

In light of the above, S.B. 1070 Section 2(B) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as expressed in the aforementioned INA provisions. *Hines,* 312 U.S. at 67. The law subverts Congress' intent that systematic state immigration enforcement will occur under the direction and close supervision of the Attorney General. Furthermore, the mandatory nature of Section 2(B)'s immigration status checks is inconsistent with the discretion Congress vested in the Attorney General to supervise and direct State officers in their immigration work according to federally-determined priorities. 8 U.S.C. § 1357(g)(3).

**[8]** In addition to Section 2(B) standing as an obstacle to Congress' statutorily expressed intent, the record unmistakably demonstrates that S.B. 1070 has had a deleterious effect on the United States' foreign relations, which weighs in favor

of preemption. *See generally Garamendi*, 539 U.S. 396 (finding obstacle preemption where a State law impinged on the Executive's authority to singularly control foreign affairs); *Crosby*, 530 U.S. 363 (same). In *Garamendi*, the Court stated that "even . . . the *likelihood* that state legislation will produce something more than *incidental* effect in conflict with express foreign policy of the National Government would require preemption of the state law." 539 U.S. at 420 (emphasis added).[12]

**[9]** The record before this court demonstrates that S.B. 1070 does not threaten a "*likelihood* . . . [of] produc[ing] something more than *incidental* effect;" rather, Arizona's law has created *actual* foreign policy problems of a magnitude far greater than incidental. *Garamendi,* 539 U.S. at 419 (emphasis added). Thus far, the following foreign leaders and bodies have publicly criticized Arizona's law: The Presidents of Mexico, Bolivia, Ecuador, El Salvador, and Guatemala; the governments of Brazil, Colombia, Honduras, and Nicaragua; the national assemblies in Ecuador and Nicaragua and the Central American Parliament; six human rights experts at the United Nations; the Secretary General and many permanent representatives of the Organization of American States; the Inter-American Commission on Human Rights; and the Union of South American Nations.

In addition to criticizing S.B. 1070, Mexico has taken affirmative steps to protest it. As a direct result of the Arizona law, at least five of the six Mexican Governors invited to travel to Phoenix to participate in the September 8-10, 2010

---

[12]The Court's decision in *Hines*, 312 U.S. 52, demonstrates that the Court has long been wary of state statutes which may interfere with foreign relations. In *Hines,* the Court considered whether Pennsylvania's 1939 Alien Registration Act survived the 1940 passage of the federal Alien Registration Act. *Id.* at 59-60. The Court found that the Pennsylvania Act could not stand because Congress "plainly manifested a purpose . . . to leave [law-abiding immigrants] free from the possibility of inquisitorial practices and police surveillance that might . . . affect our international relations." Id. at 74.

U.S.-Mexico Border Governors' Conference declined the invitation. The Mexican Senate has postponed review of a U.S.-Mexico agreement on emergency management cooperation to deal with natural disasters.

In *Crosby*, the Supreme Court gave weight to the fact that the Assistant Secretary of State said that the state law at issue "has complicated its dealings with foreign sovereigns." 530 U.S. at 383-84. Similarly, the current Deputy Secretary of State, James B. Steinberg, has attested that S.B. 1070 "threatens at least three different serious harms to U.S. foreign relations."[13] In addition, the Deputy Assistant Secretary for International Policy and Acting Assistant Secretary for International Affairs at DHS has attested that Arizona's immigration law "is affecting DHS's ongoing efforts to secure international cooperation in carrying out its mission to safeguard America's people, borders, and infrastructure." The Supreme Court's direction about the proper use of such evidence is unambiguous: "statements of foreign powers necessarily involved[,] . . . indications of concrete disputes with those powers, and opinions of senior National Government officials are competent and direct evidence of the frustration of congressional objectives by the state Act." *Crosby*, 530 U.S. at 385.[14] Here, we are presented with statements attribut-

---

[13]Arizona submitted a declaration from Otto Reich, who served in previous Administrations as, among other things, the U.S. Ambassador to Venezuela, former Assistant Administrator of USAID, and the Assistant Secretary of State for Western Hemisphere Affairs. Mr. Reich currently works in the private sector, and as a result, the district court could properly give little weight to his rebuttal of Mr. Steinberg's assertions about the impact of S.B. 1070 on current foreign affairs.

[14]Thus, Arizona's extensive criticism of this court for permitting foreign governments to file Amicus Curiae briefs is misguided. These briefs are relevant to our decision-making in this case insofar as they demonstrate the *factual* effects of Arizona's law on U.S. foreign affairs, an issue that the Supreme Court has directed us to consider in preemption cases.

Similarly, the dissent asserts that our reasoning grants a "heckler's veto" to foreign ministries and argues that a "foreign nation may not cause

able to foreign governments necessarily involved and opinions of senior United States' officials: together, these factors persuade us that Section 2(B) thwarts the Executive's ability to singularly manage the spillover effects of the nation's immigration laws on foreign affairs.

**[10]** Finally, the threat of 50 states layering their own immigration enforcement rules on top of the INA also weighs in favor of preemption. In *Wis. Dep't of Indus., Labor and Human Relations v. Gould Inc.*, 475 U.S. 282, 288 (1986), where the Court found conflict preemption, the Court explained that "[e]ach additional [state] statute incrementally diminishes the [agency's] control over enforcement of the [federal statute] and thus further detracts from the integrated scheme of regulation created by Congress." (internal citations

---

a state law to be preempted simply by complaining about the law's effects on foreign relations generally." Dissent at 4880. As a preliminary matter, we disagree with the dissent's characterization of our opinion, as we do not conclude that a foreign government's complaints *alone* require preemption. Our consideration of this evidence is consistent with the Supreme Court's concern that we not disregard or minimize the importance of such evidence. *Garamendi*, 539 U.S. at 419; *Crosby*, 530 U.S. at 385-86. Moreover, the dissent implies that S.B. 1070 is merely an internal affair, which is contrary to the Supreme Court's opinion in *Hines.* In striking down the Pennsylvania 1939 Alien Registration Act, the Court stated that:

> The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. "For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.

*Hines*, 312 U.S. at 62 (quoting *The Chinese Exclusion Cases (Chae Chan Ping v. United States)*, 130 U.S. 581, 606 (1889)).

omitted). *See also Buckman*, 531 U.S. at 350 ("[a]s a practical matter, complying with the [federal law's] detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants-burdens not contemplated by Congress in enacting the [federal laws]").

[11] In light of the foregoing, we conclude that the United States has met its burden to show that there is likely no set of circumstances under which S.B. 1070 Section 2(B) would be valid, and it is likely to succeed on the merits of its challenge. The district court did not abuse its discretion by concluding the same.

## III.   Section 3

[12] S.B. 1070 Section 3 provides: "In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 United States Code section 1304(e) or 1306(a)."[15] Ariz. Rev. Stat. Ann. § 13-1509(A) (2010). The penalty for violating Section 3 is a maximum fine of one hundred dollars, a maximum of twenty days in jail for a first vio-

---

[15]8 U.S.C. § 1304(e) provides: "Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d) of this section. Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both."

8 U.S.C. § 1306(a) further provides: "Any alien required to apply for registration and to be fingerprinted in the United States who willfully fails or refuses to make such application or to be fingerprinted, and any parent or legal guardian required to apply for the registration of any alien who willfully fails or refuses to file application for the registration of such alien shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000 or be imprisoned not more than six months, or both."

4830          UNITED STATES v. STATE OF ARIZONA

lation, and a maximum of thirty days in jail for subsequent violations. Ariz. Rev. Stat. Ann. § 13-1509(H). Section 3 "does not apply to a person who maintains authorization from the federal government to remain in the United States." Ariz. Rev. Stat. Ann. § 13-1509(F) (2010). Section 3 essentially makes it a state crime for unauthorized immigrants to violate federal registration laws.

Starting with the touchstones of preemption, punishing unauthorized immigrants for their failure to comply with federal registration laws is not a field that states have "traditionally occupied." *Wyeth*, 129 S. Ct. at 1194 (internal quotations and citations omitted); *see generally Hines*, 312 U.S. 52. Therefore, we conclude that there is no presumption against preemption of Section 3.

**[13]** Determining Congress' purpose, and whether Section 3 poses an obstacle to it, first requires that we evaluate the text of the federal registration requirements in 8 U.S.C. §§ 1304 and 1306. These sections create a comprehensive scheme for immigrant registration, including penalties for failure to carry one's registration document at all times, 8 U.S.C. § 1304(e), and penalties for willful failure to register, failure to notify change of address, fraudulent statements, and counterfeiting. 8 U.S.C. § 1306 (a)-(d). These provisions include no mention of state participation in the registration scheme. By contrast, Congress provided very specific directions for state participation in 8 U.S.C. § 1357, demonstrating that it knew how to ask for help where it wanted help; it did not do so in the registration scheme.

Arizona argues that Section 3 is not preempted because Congress has "invited states to reinforce federal alien classifications." Attempting to support this argument, Arizona cites INA sections outside the registration scheme where Congress has expressly indicated how and under what conditions states should help the federal government in immigration regulation. *See* 8 U.S.C. §§ 1621-25, 1324a(h)(2). The sections Arizona

cites authorize states to limit certain immigrants' eligibility for benefits and to impose sanctions on employers who employ unauthorized immigrants. We are not persuaded by Arizona's argument. An authorization from one section does not—without more—carry over to other sections. Nothing in the text of the INA's registration provisions indicates that Congress intended for states to participate in the enforcement or punishment of federal immigration registration rules.

[14] In addition, S.B. 1070 Section 3 plainly stands in opposition to the Supreme Court's direction: "where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Hines*, 312 U.S. at 66-67. In *Hines*, the Court considered the preemptive effect of a precursor to the INA, but the Court's language speaks in general terms about "a complete scheme of regulation,"—as to registration, documentation, and possession of proof thereof— which the INA certainly contains. Section 3's state punishment for federal registration violations fits within the Supreme Court's very broad description of proscribed state action in this area—which includes "complement[ing]" and "enforc[ing] additional or auxiliary regulations."[16] *Id.*

---

[16]We are also unpersuaded by Arizona's contention that our decision in *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005), permits the State to impose a requirement that is the same as the federal standard. In *Air Conditioning,* we considered the effect of an express preemption provision in a federal statute that regulated activity in an area "where there is no history of significant federal presence." *Id.* at 494-96. Therefore, we applied a presumption against preemption which required us to give the express preemption provision "a narrow interpretation." *Id.* at 496. By contrast, there *is* a "history of significant federal presence" in immigration registration, so there is no presumption against preemption of Section 3. Moreover, there is no express preemption provision in the federal registration scheme for this court to interpret—narrowly or otherwise. Therefore, our decision in *Air Conditioning* is not relevant here.

The Supreme Court's more recent preemption decisions involving comprehensive federal statutory schemes also indicate that federal law preempts S.B. 1070 Section 3. In *Buckman*, the Supreme Court held that the Food Drug and Cosmetics Act ("FDCA") conflict preempted a state law fraud claim against defendants who allegedly made misrepresentations to the Food and Drug Administration ("FDA"). 531 U.S. at 343. The Court explained that private parties could not assert state-fraud on the FDA claims because, "the existence of the[ ] federal enactments is a critical element in their case." *Id.* at 353. The same principle applies here to S.B. 1070 Section 3, which makes the substantive INA registration requirements "a critical element" of the state law.

By contrast, the Supreme Court found that state law claims were not preempted in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (holding that an express preemption provision in the federal Medical Device Amendments to the FDCA did not preclude a state common law negligence action against the manufacturer of an allegedly defective medical device), *Altria Grp., Inc. v. Good*, 129 S. Ct. 538 (2008) (holding that the federal Labeling Act did not expressly preempt plaintiffs' claims under the Maine Unfair Trade Practices Act alleging that Altria's advertising of light cigarettes was fraudulent), or *Wyeth*, 129 S. Ct. at 1193 (holding that the FDA's drug labeling judgments pursuant to the FDCA did not obstacle preempt state law products liability claims). In these cases, the state laws' "generality le[ft] them outside the category of requirements that [the federal statute] envisioned." *Medtronic*, 518 U.S. at 502. The state law claim in *Medtronic* was negligence, 518 U.S. at 502, the state statute in *Altria* was unfair business practices, 129 S. Ct. at 541, and the state law claim in *Wyeth* was products liability, 129 S. Ct. at 1193. All of the state laws at issue in these cases had significantly wider applications than the federal statutes that the Court found did not preempt them. Here, however, Section 3's "generality" has no wider application than the INA.

In addition, as detailed with respect to Section 2(B) above, S.B. 1070's detrimental effect on foreign affairs, and its potential to lead to 50 different state immigration schemes piling on top of the federal scheme, weigh in favor of the preemption of Section 3.

**[15]** In light of the foregoing, we conclude that the United States has met its burden to show that there is likely no set of circumstances under which S.B. 1070 Section 3 would be valid, and it is likely to succeed on the merits of its challenge. The district court did not abuse its discretion by concluding the same.

## IV.   Section 5(C)

**[16]** S.B. 1070 Section 5(C) provides that it "is unlawful for a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state." Ariz. Rev. Stat. Ann. § 13-2928(C) (2010). Violation of this provision is a class 1 misdemeanor, which carries a six month maximum term of imprisonment. Ariz. Rev. Stat. Ann. §§ 13-2928(F), 13-707(A)(1) (2010). Thus, Section 5(C) criminalizes unauthorized work and attempts to secure such work.

We have previously found that "because the power to regulate the employment of unauthorized aliens remains within the states' historic police powers, an assumption of non-preemption applies here." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 865 (9th Cir. 2009), *cert. granted*, *Chamber of Commerce of the U.S. v. Candelaria*, 130 S. Ct. 3498 (2010). Therefore, with respect to S.B. 1070 Section 5(C), we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 129 S. Ct. at 1194 (internal quotations and citations omitted) (quoting *Medtronic*, 518 U.S. at 485).

4834 UNITED STATES v. STATE OF ARIZONA

Within the INA, Congress first tackled the problem of unauthorized immigrant employment in the Immigration Reform and Control Act of 1986 ("IRCA"). We have previously reviewed IRCA's legislative history and Congress' decision not to criminalize unauthorized work. *See Nat'l Ctr. for Immigrants' Rights, Inc. v. I.N.S.*, 913 F.2d 1350 (9th Cir. 1990), *rev'd on other grounds*, 502 U.S. 183 (1991). In this case, we are bound by our holding in *National Center* regarding Congressional intent.

**[17]** In *National Center*, we considered whether the INA, through 8 U.S.C. § 1252(a), authorized the Immigration and Naturalization Service ("INS") to promulgate regulations which "imposed a condition against employment in appearance and delivery bonds of aliens awaiting deportation hearings." *Id.* at 1351. To decide this question, we carefully reviewed the history of employment-related provisions in the INA's legislative scheme—including the legislative history of the IRCA amendments. *Id.* at 1364-70. We concluded that "[w]hile Congress initially discussed the merits of fining, detaining or adopting criminal sanctions against the *employee*, it ultimately rejected all such proposals . . . Congress quite clearly was willing to deter illegal immigration by making jobs less available to illegal aliens but not by incarcerating or fining aliens who succeeded in obtaining work."[17] *Id.* at 1367-68.

**[18]** At oral argument, Arizona asserted that National Center does not control our analysis of Section 5(C) because it addressed the limited issue of whether the INS could require a condition against working in appearance and delivery bonds, which—according to Arizona—has no application to

---

[17]We find it particularly relevant here that during the hearings which shaped IRCA, the Executive Assistant to the INS Commissioner stated that the INS did "not expect the individual to starve in the United States while he is exhausting both the administrative and judicial roads that the [INA] gives him." *National Center*, 913 F.2d at 1368.

whether a state statute can criminalize unauthorized work. We agree that the ultimate legal question before us in *National Center* was distinct from the present dispute. Nonetheless, we do not believe that we can revisit our previous conclusion about Congress' intent simply because we are considering the effect of that intent on a different legal question. *See Overstreet v. United Bhd. of Carpenters and Joiners of America, Local Union No. 1506*, 409 F.3d 1199, 1205 n.8 (9th Cir. 2005) ("Ordinarily, a three-judge panel 'may not overrule a prior decision of the court.' " (quoting *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc)). Therefore, our decision in *National Center* requires us to conclude that federal law likely preempts S.B. 1070 Section 5(C), since the state law conflicts with what we have found was Congress' IRCA intent.

**[19]** The text of the relevant IRCA statutory provision—8 U.S.C. § 1324a—also supports this conclusion. Section 1324a establishes a complex scheme to discourage the employment of unauthorized immigrants—primarily by penalizing employers who knowingly or negligently hire them. The statute creates a system through which employers are obligated to verify work authorization.[18] 8 U.S.C. § 1324a(b). The veri-

---

[18]In *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), *cert. granted sub nom., Chamber of Commerce of the U.S. v. Candelaria*, 130 S. Ct. 3498 (2010), we held that IRCA did not preempt the Legal Arizona Workers Act, Ariz. Rev. Stat. Ann. § 23-211 *et seq.* IRCA contains an express preemption provision, as well as a savings clause: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens." 8 U.S.C. § 1324a(h)(2). In *Chicanos*, we held that the Legal Arizona Workers Act —which targets employers who hire undocumented immigrants and revokes their state business licenses—fits within Congress' intended meaning of "licensing" law in IRCA's savings clause and is therefore not preempted. 558 F.3d at 864-66. We also held that the INA, which makes the use of E-Verify voluntary, does not impliedly preempt Arizona from mandating that employers use the E-Verify system. *Id.* at 866-67.

4836          UNITED STATES v. STATE OF ARIZONA

fication process includes a requirement that potential employees officially attest that they are authorized to work. 8 U.S.C. § 1324a(b)(2). The statute provides that the forms potential employees use to make this attestation "may not be used for purposes other than for enforcement of this chapter and" 18 U.S.C. §§ 1001, 1028, 1546 and 1621. 8 U.S.C. § 1324a(b)(5). These sections of Title 18 criminalize knowingly making a fraudulent statement or writing; knowingly making or using a false or stolen identification document; forging or falsifying an immigration document; and committing perjury by knowingly making a false statement after taking an oath in a document or proceeding to tell the truth. This is the exclusive punitive provision against unauthorized workers in 8 U.S.C § 1324a. All other penalties in the scheme are exacted on employers, reflecting Congress' choice to exert the vast majority of pressure on the employer side.

In addition, other provisions in 8 U.S.C. § 1324a provide affirmative protections to unauthorized workers, demonstrating that Congress did not intend to permit the criminalization of work. Subsection 1324a(d)(2)(C) provides that "[a]ny personal information utilized by the [authorization verification] system may not be made available to Government agencies, employers, and other persons except to the extent necessary to verify that an individual is not an unauthorized alien." This provision would prohibit Arizona from using personal information in the verification system for the purpose of investigating or prosecuting violations of S.B. 1070 Section 5(C). Subsection 1324a(d)(2)(F) provides in even clearer language that "[t]he [verification] system may not be used for law enforcement purposes, other than for enforcement of this chapter or" the aforementioned Title 18 fraud sections.

---

Although *Chicanos* and the present case both broadly concern the preemptive effect of IRCA, the specific issues in these cases do not overlap. The scope of "licensing" law in the savings clause of the express preemption provision in IRCA has no bearing on whether IRCA impliedly preempts Arizona from enacting sanctions against undocumented workers.

Subsection 1324a(g)(1) demonstrates Congress' intent to protect unauthorized immigrant workers from financial exploitation—a burden less severe than incarceration. This section provides that "[i]t is unlawful for a person or other entity, in the hiring . . . of any individual, to require the individual to post a bond or security, to pay or agree to pay an amount, or otherwise to provide a financial guarantee or indemnity, against any potential liability arising under this section relating to such hiring . . . of the individual." Subsection 1324a(e) provides for a system of complaints, investigation, and adjudication by administrative judges for employers who violate subsection (g)(1). The penalty for a violation is "$1,000 for each violation" and "an administrative order requiring the return of any amounts received . . . to the employee or, if the employee cannot be located, to the general fund of the Treasury." 8 U.S.C. § 1324a(g)(2). Here, Congress could have required that employers repay only authorized workers from whom they extracted a financial bond. Instead, Congress required employers to repay any employee—including undocumented employees. Where Congress did not require undocumented workers to forfeit their bonds, we do not believe Congress would sanction the criminalization of work.

We therefore conclude that the text of 8 U.S.C. § 1324a, combined with legislative history demonstrating Congress' affirmative choice not to criminalize work as a method of discouraging unauthorized immigrant employment, likely reflects Congress' clear and manifest purpose to supercede state authority in this context. We are further guided by the Supreme Court's decision in *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495 (1988). There, the Court explained:

> [D]eliberate federal inaction could always imply preemption, which cannot be. There is no federal preemption *in vacuo*, without a constitutional text or a federal statute to assert it. Where a comprehensive

4838 UNITED STATES v. STATE OF ARIZONA

> federal scheme intentionally leaves a portion of the regulated field without controls, *then* the preemptive inference can be drawn—not from federal inaction alone, but from inaction joined with action.

*Id.* at 503. Given the facts in *Isla*, the Court could not draw this preemptive inference because "Congress ha[d] withdrawn from all substantial involvement in petroleum allocation and price regulation." *Id.* at 504.

The present case, however, presents facts likely to support the kind of preemptive inference that the Supreme Court endorsed, but did not find, in *Isla.* Here, Congress' inaction in not criminalizing work, joined with its action of making it illegal to hire unauthorized workers, justifies a preemptive inference that Congress intended to prohibit states from criminalizing work. Far from the situation in *Isla*, Congress has not "withdrawn all substantial involvement" in preventing unauthorized immigrants from working in the United States. It has simply chosen to do so in a way that purposefully leaves part of the field unregulated.

We are also guided by the Supreme Court's recognition, even before IRCA, that a "primary purpose in restricting immigration is to preserve jobs for American workers." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 893 (1984). As Arizona states, "Section 5(C) clearly furthers the strong federal policy of prohibiting illegal aliens from seeking employment in the United States." The Supreme Court has cautioned, however, that "conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Gould*, 475 U.S. at 286 (quoting *Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971)). *In Crosby*, the Court explained that "a common end hardly neutralizes conflicting means." 530 U.S. at 379-80. Similarly, in *Garamendi*, the Court explained that a state law was preempted because "[t]he basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves." 539 U.S. at 427. The

problem with a state adopting a different technique in pursuit of the same goal as a federal law, is that "[s]anctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions . . . undermines the congressional calibration of force." *Crosby*, 530 U.S. at 380.

In the context of unauthorized immigrant employment, Congress has deliberately crafted a very particular calibration of force which does not include the criminalization of work. By criminalizing work, S.B. 1070 Section 5(C) constitutes a substantial departure from the approach Congress has chosen to battle this particular problem. Therefore, Arizona's assertion that this provision "furthers the strong federal policy" does not advance its argument against preemption. Sharing a goal with the United States does not permit Arizona to "pull[ ] levers of influence that the federal Act does not reach." *Crosby*, 530 U.S. at 376. By pulling the lever of criminalizing work—which Congress specifically chose not to pull in the INA—Section 5(C) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. It is therefore likely that federal law preempts Section 5(C).

In addition, as detailed with respect to Section 2(B) above, S.B. 1070's detrimental effect on foreign affairs, and its potential to lead to 50 different state immigration schemes piling on top of the federal scheme, weigh in favor of the preemption of Section 5(C).

**[20]** In light of the foregoing, we conclude that the United States has met its burden to show that there is likely no set of circumstances under which S.B. 1070 Section 5(C) would not be preempted, and it is likely to succeed on the merits of its challenge. The district court did not abuse its discretion by concluding the same.

4840          UNITED STATES v. STATE OF ARIZONA

## V.  Section 6

S.B. 1070 Section 6 provides that "[a] peace officer, without a warrant, may arrest a person if the officer has probable cause to believe . . . [t]he person to be arrested has committed any public offense that makes the person removable from the United States."[19] Ariz. Rev. Stat. Ann. § 13-3883(A)(5) (2010).

**[21]** We first address the meaning of this Section. S.B. 1070 Section 6 added only subsection 5 to Ariz. Rev. Stat. Ann. § 13-3883(A), which authorizes warrantless arrests. Section 13-3883(A) already allowed for warrantless arrests for felonies, misdemeanors, petty offenses, and certain traffic-related criminal violations. Therefore, to comply with Arizona case law that "[e]ach word, phrase, clause, and sentence . . . must be given meaning so that no part will be void, inert, *redundant*, or trivial," *Williams v. Thude*, 934 P.2d 1349, 1351 (Ariz. 1997) (internal quotations omitted), we conclude, as the district court did, that Section 6 "provides for the warrantless arrest of a person where there is probable cause to believe the person *committed a crime in another state* that would be considered a crime if it had been committed in Arizona and that would subject the person to removal from the United States." 703 F. Supp. 2d at 1005 (emphasis in original). Section 6 also allows for warrantless arrests when there is probable cause to believe that an individual committed a removable offense in Arizona, served his or her time for the criminal conduct, and was released; and when there is probable cause to believe that an individual was arrested for a removable offense but was not prosecuted.

---

[19]Arizona law defines "public offense" as "conduct for which a sentence to a term of imprisonment or of a fine is provided by any law of the state in which it occurred or by any law, regulation or ordinance of a political subdivision of that state and, if the act occurred in a state other than this state, it would be so punishable under the laws, regulations or ordinances of this state or of a political subdivision of this state if the act had occurred in this state." Ariz. Rev. Stat. Ann. § 13-105(26) (2009).

Thus, the question we must decide is whether federal law likely preempts Arizona from allowing its officers to effect warrantless arrests based on probable cause of removability. Because arresting immigrants for civil immigration violations is not a "field which the States have traditionally occupied," we do not start with a presumption against preemption of Section 6. *Wyeth*, 129 S. Ct. at 1194.

**[22]** We first turn to whether Section 6 is consistent with Congressional intent. As authorized by 8 U.S.C. § 1252c, state and local officers may, "to the extent permitted by relevant State . . . law," arrest and detain an individual who:

(1) is an alien illegally present in the United States; and

(2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction, *but only after* the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual.

8 U.S.C. § 1252c (emphasis added). Nothing in this provision permits warrantless arrests, and the authority is conditioned on compliance with a mandatory obligation to confirm an individual's status with the federal government prior to arrest. Moreover, this provision only confers state or local arrest authority where the immigrant has been convicted of a felony. Section 6, by contrast, permits warrantless arrests if there is probable cause that a person has "committed any public offense that makes the person removable." Misdemeanors, not just felonies, can result in removablility. *See generally Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006) (en banc). Thus, Section 6 authorizes state and local officers to effectuate more intrusive arrests than Congress has permitted in Section 1252c.[20] Moreover, none of the circumstances

---

[20]Arizona argues that we should "construe[ ] section 6 so as to require officers to confirm with federal authorities that an alien has committed a

in which Congress has permitted federal DHS officers to arrest immigrants without a warrant are as broad as Section 6. Absent a federal officer actually viewing an immigration violation, warrantless arrests under 8 U.S.C. § 1357(a) require a likelihood that the immigrant will escape before a warrant can be obtained. 8 U.S.C. §§ 1357(a)(2), (a)(4), (a)(5). Section 6 contains no such requirement and we are not aware of any INA provision indicating that Congress intended state and local law enforcement officers to enjoy greater authority to effectuate a warrantless arrest than federal immigration officials.

Thus, Section 6 significantly expands the circumstances in which Congress has allowed state and local officers to arrest immigrants. Federal law does not allow these officers to conduct warrantless arrests based on probable cause of *civil* removability, but Section 6 does. Therefore, Section 6 interferes with the carefully calibrated scheme of immigration enforcement that Congress has adopted, and it appears to be preempted. Arizona suggests, however, that it has the inherent authority to enforce federal *civil* removability without federal authorization, and therefore that the United States will not ultimately prevail on the merits. We do not agree. Contrary to the State's view, we simply are not persuaded that Arizona has the authority to unilaterally transform state and local law enforcement officers into a state-controlled DHS force to carry out its declared policy of attrition.

---

public offense that makes the alien removable before making a warrantless arrest under section 6." Even if we interpreted Section 6 as Arizona suggests, the provision would still permit more intrusive state arrests than Congress has sanctioned, because it permits arrests on the basis of misdemeanor removability, which Congress has not provided for in 8 U.S.C. § 1252c. Further, even if a law enforcement officer confirmed with the federal government that an individual had been convicted of murder—a felony that would clearly result in removability, *see* 8 U.S.C. § 1227(a)(2)(A)(iii)—Section 6 would still expand the scope of § 1252c by permitting warrantless arrests.

UNITED STATES v. STATE OF ARIZONA          4843

**[23]** We have previously suggested that states do not have the inherent authority to enforce the civil provisions of federal immigration law. In *Gonzales v. City of Peoria*, 722 F.2d 468, 475 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), we held that "federal law does not preclude local enforcement of the *criminal* provisions of the [INA]." (Emphasis added). There, we "assume[d] that the *civil* provisions of the [INA] regulating authorized entry, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration." *Id.* at 474-75 (emphasis added). We are not aware of any binding authority holding that states possess the inherent authority to enforce the civil provisions of federal immigration law—we now hold that states do not have such inherent authority.[21]

The Sixth Circuit has come to the same conclusion. *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008).[22] In *Urrieta*,

---

[21]The dissent argues that "the Supreme Court explicitly recognized—in one of our California cases—that state police officers have authority to question a suspect regarding his or her immigration status." Dissent at 4887 (citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005)). The dissent mischaracterizes the issue in *Mena* and the facts of the case in order to make it appear relevant to the case before us now. The Court explained that "[a]s the Court of Appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status." *Id.* at 101. In summarizing the facts of the case, the Court explained that, "[a]ware that the West Side Locos gang was composed primarily of illegal immigrants, the officers had notified the Immigration and Naturalization Service (INS) that they would be conducting the search, and an INS officer accompanied the officers executing the warrant. During their detention in the garage, an officer asked for each detainee's name, date of birth, place of birth, and immigration status. The INS officer later asked the detainees for their immigration documentation." *Id.* at 96. Thus, contrary to the dissent's contention, *Mena* did not recognize that state officers can enforce federal civil immigration law with no federal supervision or involvement.

[22]The dissent's characterization of our discussion of *Urrieta* is inaccurate. *See* Dissent at 4884-85. We do not "rely" on *Urrieta* to conclude that

4844          UNITED STATES v. STATE OF ARIZONA

the court explained that "[i]n its response to Urrieta's motion to suppress evidence, the government originally argued that Urrieta's extended detention was justified on the grounds that . . . [county] Deputy Young had reason to suspect that Urrieta was an undocumented immigrant. The government withdrew th[is] argument, however, after conceding that [it] misstated the law." *Id.* at 574. The Sixth Circuit cited 8 U.S.C. § 1357(g), which it summarized as "stating that local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions." *Id.* Therefore, the court required that "[t]o justify Urrieta's extended detention [ ] the government must point to specific facts demonstrating that Deputy Young had a reasonable suspicion that Urrieta was engaged in some nonimmigration-related illegal activity." *Id.*

---

states do not have the inherent authority to enforce the civil provisions of federal immigration law. We cite this case in laying out the existing legal landscape on this issue.

In addition, the dissent states that we "ignore clear Supreme Court precedent" in concluding states do not possess this inherent authority. Dissent at 4886. The dissent cites three Supreme Court cases dealing with state officers enforcing federal *criminal* laws. These cases are inapposite, as Section 6 concerns state enforcement of federal *civil* immigration laws. Although the dissent conflates federal criminal and civil immigration laws in this matter, this court has long recognized the distinction. *See Martinez-Medina v. Holder*, ___ F.3d ___, 2011 WL 855791 *6 (9th Cir. 2011) ("Nor is there any other federal criminal statute making unlawful presence in the United States, alone, a federal crime, although an alien's willful failure to register his presence in the United States when required to do so is a crime . . . and other criminal statutes may be applicable in a particular circumstance. Therefore, Gonzales's observation that 'an alien who is illegally present in the United States . . . [commits] only a civil violation,' and its holding that an alien's 'admission of illegal presence . . . does not, without more, provide probable cause of the criminal violation of illegal entry,' always were, and remain, the law of the circuit, binding on law enforcement officers.") (quoting *Gonzales*, 722 F.2d at 476-77 (9th Cir. 1983).

UNITED STATES v. STATE OF ARIZONA          4845

We recognize that our view conflicts with the Tenth Circuit's. *See United States v. Vasquez-Alvarez*, 176 F.3d 1294 (10th Cir. 1999). In *Vasquez-Alvarez*, the Tenth Circuit affirmed the denial of a motion to suppress where the defendant's "arrest was based solely on the fact that Vasquez was an illegal alien." *Id.* at 1295. The arrest did not comply with the requirements of 8 U.S.C. § 1252c, and the defendant argued that the evidence found as a result of that arrest should be suppressed. The Tenth Circuit disagreed, holding that § 1252c "does not limit or displace the preexisting general authority of state or local police officers to investigate and make arrests for violations of federal laws, including immigration laws." *Id.* at 1295. The Tenth Circuit based its conclusion on "§ 1252c's legislative history and [ ] subsequent Congressional enactments providing additional nonexclusive sources of authority for state and local officers to enforce federal immigration laws." *Id.* at 1299. The legislative history to which the court refers consists of the comments of § 1252c's sponsor, Representative Doolittle. As the court recounts, Doolittle stated:

> With such a threat to our public safety posed by criminal aliens, one would think that we would give law enforcement all the tools it needs to remove these criminals from our streets, but unfortunately just the opposite is true. In fact, the Federal Government has tied the hands of our State and local law enforcement officials by actually prohibiting them from doing their job of protecting public safety. I was dismayed to learn that the current Federal law prohibits State and local law enforcement officials from arresting and detaining *criminal aliens* whom they encountered through their routine duties
>
> . . .
>
> My amendment would also permit State and local law enforcement officials to assist the INS by grant-

4846          UNITED STATES v. STATE OF ARIZONA

> ing them the authority in their normal course of duty to arrest and detain criminal aliens until the INS can properly take them into Federal custody.
>
>       . . .
>
> My amendment is supported by our local law enforcement because they know that fighting illegal immigration can no longer be left solely to Federal agencies. Let us untie the hands of those we ask to protect us and include my amendment in H.R. 2703 today.

*Id.* at 1298 (citing 142 Cong. Rec. 4619 (1996) (comments of Rep. Doolittle)). Interpreting these comments, the Tenth Circuit stated: "As discussed at length above, § 1252c's legislative history demonstrates that the purpose of the provision was to eliminate perceived federal limitations . . . There is simply no indication whatsoever in the legislative history to § 1252c that Congress intended to displace preexisting state or local authority to arrest individuals violating federal immigration laws." *Id.* at 1299-1300.[23]

The Tenth Circuit's interpretation of this legislative history is not persuasive. Section 1252c was intended to grant authority to state officers to aid in federal immigration enforcement because Congress thought state officers lacked that authority. The Tenth Circuit's conclusion is nonsensical: we perceive no reason why Congress would display an intent "to displace preexisting . . . authority" when its purpose in passing the law

---

[23]The dissent alleges that we have improperly focused on a single Representative's comment in assessing the meaning of § 1252c. Dissent at 4889-90. The dissent argues that we ought to follow the Tenth Circuit's example in *Vasquez-Alvarez* and hold that § 1252c has no preemptive effect on a state's inherent ability to enforce the civil provisions of federal immigration law. Dissent at 4889-91. We note that the Tenth Circuit went to great lengths assessing and relying on the very legislative history that the dissent now chastises us for evaluating.

was to grant authority it believed was otherwise lacking. *Id.* at 1300.

*Vasquez-Alvarez* also cited "subsequent Congressional enactments providing additional nonexclusive sources of authority for state and local officers to enforce federal immigration laws" in support of its conclusion that § 1252c does not prevent state officers from making civil immigration-based arrests pursuant to state law. *Id.* at 1299. The court noted that "in the months following the enactment of § 1252c, Congress passed a series of provisions designed to encourage cooperation between the federal government and the states in the enforcement of federal immigration laws." *Id.* at 1300 (citing § 1357(g)). The court interpreted § 1357(g)(10) to mean that "formal agreement [pursuant to § 1357(g) (1)-(9)] is not necessary for state and local officers 'to cooperate with the Attorney General in identification, apprehension, detention, or removal of aliens.' " *Id.* at 1300 (quoting 8 U.S.C. § 1357(g)(10)(B)). To reason that the enactment of § 1357(g) means that Congress did not intend to limit state and local officers' alleged inherent authority to make civil immigration arrests in § 1252c, requires a broad reading of § 1357(g)(10); we explain above in II.B. the reasons why we reject such a broad reading of this provision.

Subsection (g)(10) neither grants, nor assumes the preexistence of, inherent state authority to enforce civil immigration laws in the absence of federal supervision. If such authority existed, all of 8 U.S.C. § 1357(g)—and § 1252c for that matter—would be superfluous, and we do not believe that Congress spends its time passing unnecessary laws.[24]

---

[24]The U.S. Department of Justice's Office of Legal Counsel ("OLC") issued a memorandum in 2002—at which time OLC was headed by then Associate Attorney General Jay C. Bybee, now a United States Circuit Judge, as Arizona emphasizes—concluding that (1) the authority to arrest for violation of federal law inheres in the states, subject only to preemption by federal law; (2) a 1996 OLC memo incorrectly concluded that state

4848                UNITED STATES v. STATE OF ARIZONA

**[24]** In sum, we are not persuaded that Arizona has the inherent authority to enforce the *civil* provisions of federal immigration law. Therefore, Arizona must be federally-authorized to conduct such enforcement. Congress has created a comprehensive and carefully calibrated scheme—and has authorized the Executive to promulgate extensive regulations —for adjudicating and enforcing civil removability. S.B. 1070 Section 6 exceeds the scope of federal authorization for Arizona's state and local officers to enforce the civil provisions of federal immigration law. Section 6 interferes with the federal government's prerogative to make removability determinations and set priorities with regard to the enforcement of civil immigration laws. Accordingly, Section 6 stands as an obstacle to the full purposes and objectives of Congress.

---

police lack the authority to arrest immigrants on the basis of civil deportability; and (3) 8 U.S.C. § 1252c does not preempt state arrest authority. To conclude that § 1252c does not preempt inherent state arrest authority, the OLC memo relies entirely on the Tenth Circuit's decision in *Vasquez-Alvarez*—the logic of which we have already rejected.

The dissent quotes from the 2002 OLC memo in claiming that § 1252c is not made superfluous by interpreting it to have no preemptive effect. Dissent at 4893. We are neither persuaded, nor bound by the arguments in this memo. It is an axiomatic separation of powers principle that legal opinions of Executive lawyers are not binding on federal courts. The OLC memo itself demonstrates why this is: the OLC's conclusion about the issue in the 2002 memo was different in 1996 under the direction of President Clinton, and was different in 1989, under the direction of President George H.W. Bush.

The dissent also claims that "Congress has authority to enact legislation which is designed merely to clarify, without affecting the distribution of power." Dissent at 4893. The dissent cites language from the Reaffirmation—Reference to One Nation Under God in the Pledge of Allegiance, stating, "An Act to reaffirm the reference to one Nation under God." Pub. L. No. 107-293 (2002). The dissent's argument is unavailing, as § 1252c contains no reference to anything remotely related to a "reaffirmation" of a state's alleged inherent authority to enforce the civil provisions of federal immigration law.

In addition, as detailed with respect to Section 2(B) above, S.B. 1070's detrimental effect on foreign affairs, and its potential to lead to 50 different state immigration schemes piling on top of the federal scheme, weigh in favor of the preemption of Section 6.

**[25]** In light of the foregoing, we conclude that the United States has met its burden to show that there is likely no set of circumstances under which S.B. 1070 Section 6 would be valid, and it is likely to succeed on the merits of its challenge. The district court did not abuse its discretion by concluding the same.

## VI. Equitable Factors

Once a party moving for a preliminary injunction has demonstrated that it is likely to succeed on the merits, courts must consider whether the party will suffer irreparable harm absent injunctive relief, and whether the balance of the equities and the public interest favor granting an injunction. *Winter v. Natural Res. Def. Council Inc.*, 129 S. Ct. 365, 374 (2008).

We have "stated that an alleged constitutional infringement will often alone constitute irreparable harm." *Assoc. Gen. Contractors v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (internal quotation marks omitted). We have found that "it is *clear that it would not be equitable or in the public's interest to allow the state* . . . to violate the requirements of federal law, especially when there are no adequate remedies available . . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852-53 (9th Cir. 2009) (emphasis added); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059-60 (9th Cir. 2009) (recognizing that the balance of equities and the public interest weighed in favor of granting a preliminary injunction against a likely-preempted local ordinance).

**[26]** Accordingly, we find that as to the S.B. 1070 Sections on which the United States is likely to prevail, the district court did not abuse its discretion in finding that the United States demonstrated that it faced irreparable harm and that granting the preliminary injunction properly balanced the equities and was in the public interest.

### Conclusion

For the foregoing reasons, we AFFIRM the preliminary injunction enjoining enforcement of S.B. 1070 Sections 2(B), 3, 5(C), and 6.

**AFFIRMED; REMANDED.**

---

NOONAN, Circuit Judge, concurring:

I concur in the opinion of the court. I write separately to emphasize the intent of the statute and its incompatibility with federal foreign policy.

Consideration of the constitutionality of the statute begins with Section 1 of the law, which in entirety, reads as follows:

> Sec. 1. Intent
>
> The legislature finds that there is a compelling interest in the cooperative enforcement of federal immigration laws throughout all of Arizona. The legislature declares that the intent of this act is to make attrition through enforcement the public policy of all state and local government agencies in Arizona. The provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.

This section of the act constitutes an authoritative statement of the legislative purpose. The purpose is "attrition," a noun which is unmodified but which can only refer to the attrition of the population of immigrants unlawfully in the state. The purpose is to be accomplished by "enforcement," also unmodified but in context referring to enforcement of law by the agencies of Arizona. The provisions of the act are "intended to work together." Working together, the sections of the statute are meant "to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States."

It would be difficult to set out more explicitly the policy of a state in regard to aliens unlawfully present not only in the state but in the United States. The presence of these persons is to be discouraged and deterred. Their number is to be diminished. Without qualification, Arizona establishes its policy on immigration.

As Section 1 requires, each section of the statute must be read with its stated purpose in mind. Section 2 might, in isolation from Section 1, be read as requiring information only. Such a reading would ignore the intent established in Section 1, to secure attrition through enforcement. As the United States observes, Arizona already had the capability of obtaining information on immigrants by consulting the federal database maintained by the federal government. Section 2 of the statute provides for more — for the detention of immigrants to achieve the purpose of the statute. Section 2 is not intended as a means of acquiring information. It is intended to work with the other provisions of the act to achieve enforcement.

As the opinion of the court makes clear, Sections 3, 5 and 6 are unconstitutional. Section 2 is equally unconstitutional in its function as their support.

Section 1's profession of "cooperative" enforcement of federal immigration laws does not alter Arizona's enactment of

its own immigration policy distinct from the immigration policy and the broader foreign policy of the United States.

Federal foreign policy is a pleonasm. What foreign policy can a federal nation have except a national policy? That fifty individual states or one individual state should have a foreign policy is absurdity too gross to be entertained. In matters affecting the intercourse of the federal nation with other nations, the federal nation must speak with one voice.

That immigration policy is a subset of foreign policy follows from its subject: the admission, regulation and control of foreigners within the United States. By its subject, immigration policy determines the domestication of aliens as American citizens. It affects the nation's interactions with foreign populations and foreign nations. It affects the travel of foreigners here and the trade conducted by foreigners here. It equally and reciprocally bears on the travel and trade of Americans abroad. As the declarations of several countries or governmental bodies demonstrate in this case, what is done to foreigners here has a bearing on how Americans will be regarded and treated abroad.

That the movement of the people of one nation into the boundaries of another nation is a matter of national security is scarcely a doubtful or debatable matter. Almost everyone is familiar with how the movement of the Angles and the Saxons into Roman Britain transformed that country. The situation of the United States is less precarious. Nonetheless, an estimated 10.8 million foreigners have illegally taken up residence in our country. U.S. Dept. of Homeland Sec., Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2010* at 2. True, at the maximum, their number is less than 4% of our population. They are not about to outnumber our citizens. Still, in individual towns and areas those illegally present can be a substantial presence. In the state of Arizona, their esti-

mated number is 470,000, or seven percent of the population of the state. *Id.* at 4.

The local impact appears to call for local response. Yet ineluctably the issue is national. The people of other nations are entering our nation and settling within its borders contrary to our nation's stated requirements. We must deal with people of other nations and so must deal with other nations. The problems are local but our whole nation is affected. Reasonably, the nation has made enforcement of criminal sanctions against aliens criminally present in the United States the top priority of the federal government. United States Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2009* at 1.

Against this background, the following propositions are clear:

The foreign policy of the United States preempts the field entered by Arizona. Foreign policy is not and cannot be determined by the several states. Foreign policy is determined by the nation as the nation interacts with other nations. Whatever in any substantial degree attempts to express a policy by a single state or by several states toward other nations enters an exclusively federal field.

Federal foreign policy is determined by Congress when Congress exercises the power to declare war conferred upon it by Article I, Section 8 of the Constitution. Foreign policy is also determined by the Senate when it exercises the power to ratify a treaty, the power conferred upon it by Article II, Section 2. Congress also determines foreign policy when it lays excise taxes upon foreign imports under Article I, Section 8. Congress further determines foreign policy when it authorizes sanctions against a nation, e.g., *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000).

The foreign policy of the nation consists in more than a declaration of war, the making of a treaty, the imposition of

4854                UNITED STATES V. STATE OF ARIZONA

a tax, and the imposition of sanctions. The foreign policy of the nation is also established by acts of executive power — among others, executive agreements with foreign nations; the appointment of ambassadors to foreign nations; the exchange of information with foreign governments; the encouragement of trade with foreign countries; and the facilitation of the travel abroad of Americans and of travel within the United States by foreigners. In these several ways a federal foreign policy is forged that is as palpable and durable as that expressed by a particular act of legislation or by the ratification of a particular treaty.

Less than eight years ago the Supreme Court reviewed and reaffirmed the position of the Executive Branch in forming foreign policy preemptive of legislation by a state. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003). Strong humanitarian considerations supported California's legislation to provide a remedy against insurance companies that had profited from the Nazi treatment of Jewish victims of the Holocaust. Recognizing that "the iron fist" of California might be more effective than the gentler approach taken by the Executive Branch, the Supreme Court assembled cases showing the President's "unique responsibility" for the conduct of foreign policy. *Id.* at 415. Noting that no express text in the Constitution conferred this authority, the Court quoted both Hamilton and Madison in *The Federalist* on the structure of the nation being designed. Structure was stronger than text. The Supreme Court demonstrated that strength in an unbroken line of decisions acknowledging presidential leadership in foreign affairs. *Id.* at 413-415. Presidential power to preempt states from acting in matters of foreign policy is beyond question.

To take one example from our relations to our nearest neighbor to the South, it is an expression of federal foreign policy that the State Department issues passports by whose use approximately twenty million American citizens enter Mexico annually, while the State Department annually issues approximately one million visas which enable citizens of

Mexico to enter this country. U.S. Dep't of Commerce, Int'l Trade Admin., *2009 United States Resident Travel Abroad* 3 (2010); *U.S. Dep't of State, Report of the Visa Office 2010* at Table XVII (2011).

The foreign policy of the United States is further established by trade agreements made between this country and Mexico manifesting the desire to permit the importation of a variety of goods from Mexico and the desire to export goods from the United States into Mexico.

An objective assessment of the foreign policy of the United States toward Mexico would pronounce that policy to be one of cordiality, friendship and cooperation. The tangible expression of this policy is the export of $14.8 billion in goods in January 2011 and the importation of $19.7 billion in goods from Mexico in the same month. News Release, U.S. Census Bureau, U.S. Bureau of Economic Analysis, U.S. Int'l Trade in Goods and Services 16 (March 10, 2011).

Understandably, the United States finds such a policy preemptive of a single state's uninvited effort to enter the field of immigration law.

The Arizona statute before us has become a symbol. For those sympathetic to immigrants to the United States, it is a challenge and a chilling foretaste of what other states might attempt. For those burdened by unlawful immigration, it suggests how a state could tackle that problem. It is not our function, however, to evaluate the statute as a symbol. We are asked to assess the constitutionality of five sections on their face integrated by the intent stated in Section 1. If we read Section 1 of the statute, the statute states the purpose of providing a solution to illegal immigration into the United States. So read, the statute is a singular entry into the foreign policy of the United States by a single state. The district court properly enjoined implementation of the four sections of the statute.

4856          UNITED STATES v. STATE OF ARIZONA

BEA, Circuit Judge, concurring in part and dissenting in part:

I quite agree with the majority that "[t]he purpose of Congress is the ultimate touchstone" in determining whether Arizona's S.B. 1070 is preempted under the Supremacy Clause. *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963). Thus, this court is tasked with determining whether Congress intended to fence off the states from any involvement in the enforcement of federal immigration law. It is *Congress's* intent we must value and apply, not the intent of the Executive Department, the Department of Justice, or the United States Immigration and Customs Enforcement. Moreover, it is the *enforcement* of immigration laws that this case is about, not whether a state can decree who can come into the country, what an alien may do while here, or how long an alien can stay in this country.

By its very enactment of statutes, Congress has provided important roles for state and local officials to play in the enforcement of federal immigration law. First, the states are free, even without an explicit agreement with the federal government, "to communicate with the Attorney General regarding the immigration status of any individual." 8 U.S.C. § 1357(g)(10)(A). Second, to emphasize the importance of a state's involvement in determining the immigration status of an individual, Congress has commanded that federal authorities "*shall* respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual." *Id.* § 1373(c) (emphasis added). Third, putting to one side communications from and responses to a state regarding an individual's immigration status, no agreement with the federal government is necessary for states "otherwise [than through communications regarding an individual's immigration status] to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). Finally, Congress has even provided that state officers are authorized to arrest and

UNITED STATES v. STATE OF ARIZONA          4857

detain certain illegal aliens. *Id.* § 1252c. Recognizing the important role of states in enforcing immigration law, the record shows that the federal government has welcomed efforts by New Jersey[1] and Rhode Island,[2] efforts which Arizona attempts to mirror with S.B. 1070. The record is bereft of any evidence that New Jersey's or Rhode Island's efforts have in any way interfered with federal immigration enforcement. To the contrary, the federal government embraced such programs and increased the number of removal officers to handle the increased workload.

Nonetheless, the United States has here challenged Arizona S.B. 1070 before it went into effect and, thus, made a *facial* challenge to the legislation. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As the Supreme Court stated:

---

[1]In August 2007, the attorney general of New Jersey issued a directive which stated:

> When a local, county, or State law enforcement officer makes an arrest for any indictable crime, or for driving while intoxicated, the arresting officer or a designated officer, as part of the booking process, shall inquire about the arrestee's citizenship, nationality and immigration status. If the officer has reason to believe that the person may not be lawfully present in the United States, the officer shall notify [ICE] during the arrest booking process.

Anne Milgram, Attorney General Law Enforcement Directive No. 2007-3.

[2]Rhode Island Executive Order 08-01, "Illegal Immigration Control Order," issued March 27, 2008, states at paragraph 6:

> It is urged that all law enforcement officials, including state and local law enforcement agencies take steps to support the enforcement of federal immigration laws by investigating and determining the immigration status of all non-citizens taken into custody, incarcerated, or under investigation for any crime and notifying federal authorities of all illegal immigrants discovered as a result of such investigations.

In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases. . . . Exercising judicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). Further:

Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

*Id.* at 450-51 (internal quotation marks and citations omitted).[3]

---

[3]"While some Members of the [Supreme] Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.' " *Wash. State Grange*, 552 U.S. at 449 (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (Stevens, J., concurring in judgments)). The high facial challenge standard was reaffirmed just last term. *See United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010).

UNITED STATES v. STATE OF ARIZONA          4859

Our task, then, is—or *should* be—to examine the Arizona legislation and relevant federal statutes to determine whether, under the United States' facial challenge, S.B. 1070 has applications that do not conflict with Congress's intent. I respectfully dissent from the majority opinion as to Sections 2(B) (entitled "Cooperation and assistance in enforcement of immigration laws; indemnification") and 6 (entitled "Arrest by officer without warrant"), finding their reasoning as to Congress's intent without support in the relevant statutes and case law. As to Sections 3 and 5(C), I concur in the result and the majority of the reasoning, although I dissent to the portion of the majority's reasoning which allows complaining foreign countries to preempt a state law. I address S.B. 1070's sections in numerical order, as the majority did.

## I.   Section 2(B)

I dissent from the majority's determination that Section 2(B) of Arizona S.B. 1070[4] is preempted by federal law and

---

[4]Section 2(B) of S.B. 1070 provides in relevant part:

For any lawful stop, detention or arrest made by [an Arizona] law enforcement official or a law enforcement agency . . . in the enforcement of any other law or ordinance of a county, city or town or this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation. Any person who is arrested shall have the person's immigration status determined before the person is released. The person's immigration status shall be verified with the federal government pursuant to 8 United States Code section 1373(c) . . . A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer or agency any of the following:

    1.   A valid Arizona driver license.

    2.   A valid Arizona nonoperating identification license.

4860          UNITED STATES V. STATE OF ARIZONA

therefore is unconstitutional on its face. As I see it, Congress has clearly expressed its intention that state officials *should* assist federal officials in checking the immigration status of aliens, *see* 8 U.S.C. § 1373(c), and in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U.S.C. § 1357(g)(10)(B). The majority comes to a different conclusion by minimizing the importance of § 1373(c) and by interpreting § 1357(g)(10) precisely to invert its plain meaning "*Nothing* in this subsection shall be construed to require an agreement . . . to communicate with the Attorney General regarding the immigration status of any individual" (emphasis added) to become "*Everything* in this subsection shall be construed to require an agreement."[5] Further, the majority mischaracterizes the limited

---

3. A valid tribal enrollment card or other form of tribal identification.

4. If the entity requires proof of legal presence in the United States before issuance, any valid United States federal, state or local government issued identification.

Ariz. Rev. Stat. Ann. § 11-1051(B) (2010).

[5]The majority has apparently mastered its Lewis Carroll:

"I don't know what you mean by 'glory,' " Alice said.

Humpty Dumpty smiled contemptuously. "Of course you don't— till I tell you. I meant 'there's a nice knock-down argument for you!' "

"But 'glory' doesn't mean 'a nice knockdown argument,' " Alice objected.

"When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master —that's all."

scope of Section 2(B), misinterprets the Supreme Court's cases on foreign relations preemption to allow any complaining foreign country to preempt a state law, and holds that the prospect of all 50 states assisting the federal government in identifying illegal aliens is—to Congress—an unwanted burden. I discuss each one of these errors in turn below.

The district court found that Section 2(B) resulted in an unconstitutional invasion of the province of federal immigration law for a variety of reasons. But there seems little point to examine and rebut the district court's findings, because the majority opinion does not adopt any of them.[6] Rather, the

---

Lewis Carroll, *Through the Looking Glass and What Alice Found There*, *in* THE ANNOTATED ALICE: THE DEFINITIVE EDITION 213 (Martin Gardner ed., Norton Publishers) (2000).

I am disappointed the majority does not take Lewis Carroll's humorous example of word traducing seriously to explain how the majority's use of "nothing" in 8 U.S.C. § 1357(g)(10) could be made to mean "everything."

 'Twas the saying of an ancient sage that humour was the only test
 of gravity, and gravity of humour. For a subject which would not
 bear raillery was suspicious; and a jest which would not bear a
 serious examination was certainly false wit.

Anthony Cooper, Earl of Shaftesbury, *Essay on the Freedom of Wit and Humour*, sec. 5 (1709).

However, it is not accurate to imply that recourse to the estimable Humpty-Dumpty is to slip the bounds of judicial argument. A quick Westlaw search shows six mentions in Supreme Court opinions of Humpty Dumpty's views as to how the meanings of words can be changed, and another dozen in this court—including one case in which the author of the majority here concurred. *See Scribner v. Worldcom, Inc.*, 249 F.3d 902 (9th Cir. 2001).

[6]It is curious the majority opinion spends as much time as it does interpreting the language of Section 2(B) to be a mandate of immigration status checks of every arrestee, regardless whether there is reasonable suspicion he is an illegal alien—contrary to Arizona's interpretation of its own statute. Maj. Op. at 4816-18. That interpretation was *used* by the district court to conclude state actions would result in invasion of the federal province

4862        UNITED STATES v. STATE OF ARIZONA

majority opinion rests its case solely on its inverted reading
of § 1357(g), which prescribes the process by which Congress
intended state officers to play a role in the enforcement of
federal immigration laws.

### A.  8 U.S.C. § 1373(c)

As noted above, Congress has clearly stated its intention to
have state and local agents assist in the enforcement of federal
immigration law, at least as to the identification of illegal
aliens, in two federal code sections. First is 8 U.S.C.
§ 1373(c), which reads:

> The Immigration and Naturalization Service shall
> respond to an inquiry by a Federal, State, or local
> government agency, seeking to verify or ascertain
> the citizenship or immigration status of any individ-
> ual within the jurisdiction of the agency for any pur-
> pose authorized by law, by providing the requested
> verification or status information.

---

of immigration enforcement, by over-burdening federal immigration status
checking resources. The majority adopts the district court's statutory anal-
ysis of Section 2(B)—violating a slew of canons of statutory construction
along the way—but fails to arrive at the district court's findings, findings
thought necessary by the district court to conclude Section 2(B) was pre-
empted. The district court incorrectly analyzed the Arizona statute to make
its incorrect point that immigration inquiries will overburden federal
resources. But at least it made a point. The majority trudges the same ana-
lytical trail, but goes nowhere. It rather gives the impression that a portion
of the majority opinion has been left at the printer.

Of course, it is awkward indeed to argue that immigration status inqui-
ries by state officials *can* "overburden" federal officials when 8 U.S.C.
§ 1373(c) reads so plainly ("The Immigration and Naturalization Service
*shall* respond . . . ." (emphasis added)). Had Congress wanted to give fed-
eral immigration officers *discretion* as to whether to answer such inqui-
ries, it could have used "may" rather than "shall," as it does in 8 U.S.C.
§ 1357(g)(1) regarding federal officials' discretion to enter into written
agreements with the states regarding enforcement of immigration laws.

UNITED STATES v. STATE OF ARIZONA          4863

8 U.S.C. § 1373(c). The title of § 1373(c) is "Obligation to respond to inquiries." Thus, § 1373(c) *requires* that United States Immigration and Customs Enforcement ("ICE")[7] respond to an inquiry by *any* federal, state, or local agency seeking the immigration status of any person. The Report of the Senate Judiciary Committee accompanying the Senate Bill explained that the "acquisition, maintenance, and *exchange* of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996) (emphasis added).

Section 1373(c) does not limit the number of inquiries that state officials can make, limit the circumstances under which a state official may inquire, nor allow federal officials to limit their responses to the state officials.[8] Indeed, as established by

---

[7]The statute has not been amended to reflect that the Immigration and Naturalization Service ceased to exist in 2003. ICE, an agency within the Department of Homeland Security, now performs the immigration-related functions.

[8]Another example of federal authorization for state inquiries into an alien's immigration status is 8 U.S.C. § 1644, part of the 1996 Welfare Reform Act. This section states "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644. The House Conference Report accompanying the Welfare Reform Act explained: "The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens . . . . The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Conf. Rep. No. 104-725, at 383 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2649, 2771. The title and placement of the statute seems to have more to do with helping states administer benefits than to achieve removals of illegal aliens. But the statute does reflect Congress's repeatedly stated intention to provide for the free flow of immigration status information between the states and the federal immigration establishment.

4864          UNITED STATES V. STATE OF ARIZONA

the declaration of the United States' own Unit Chief for the
Law Enforcement Support Center ("LESC"), the LESC was
established "to provide alien status determination support to
federal, state, and local law enforcement on a 24-hours-a-day,
seven-days-a-week basis." Section 1373(c) demonstrates Con-
gress's clear intent for state police officials to communicate
with federal immigration officials in the first step of immigra-
tion enforcement—identification of illegal aliens.

The majority misstates my interpretation of § 1373(c)'s
scope. Neither I, nor Arizona, claim § 1373(c) allows Arizona
to pursue its "own immigration policy." Maj. Op. at 4823.
Instead, § 1373(c) demonstrates Congress's intent for Arizona
to help enforce *Congress's* immigration policy, but in a way
with which the Executive cannot interfere. Congress has
*required* that the federal government respond to state and
local inquires into a person's immigration status, 8 U.S.C.
§ 1373(c), which allows states to "cooperate with the Attor-
ney General in the identification, apprehension, detention, or
removal of [illegal] aliens," *id.* § 1357(g)(10)(B).

   B.   *8 U.S.C. § 1357(g)*

The second federal code section which states Congress's
intention to have state authorities assist in identifying illegal
aliens is 8 U.S.C. § 1357(g), entitled "Performance of immi-
gration officer functions by State officers and employees."
Subsections (g)(1)-(9) provide the precise conditions under
which the Attorney General may "deputize" state police offi-
cers (creating, in the vernacular of the immigration field,
"287(g) officers") for immigration enforcement pursuant to an
explicit written agreement. For example, § 1357(g)(1) defines
the scope of any such agreement, § 1357(g)(3) provides that
the Attorney General shall direct and supervise the deputized
officers, § 1357(g)(6) prohibits the Attorney General from
deputizing state officers if a federal employee would be dis-
placed, and § 1357(g)(7)-(8) describe the state officers' liabil-
ity and immunity. Section 1357(g)(9) clarifies that no state or

locality shall be required to enter into such an agreement with the Attorney General. Finally, § 1357(g)(10) explains what happens if *no* such agreement is entered into: it recognizes the validity of certain conduct by state and local officers, and explicitly excepts such conduct from a requirement there be a written agreement between the state and federal authorities:

> Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—
>
>> (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or
>>
>> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

8 U.S.C. § 1357(g)(10).

The majority's error is to read § 1357(g)(1)-(9), which provides the precise conditions under which the Attorney General *may* enter into written agreements to "deputize" officers, as the *exclusive* authority which Congress intended state officials to have in the field of immigration enforcement. That reading is made somewhat awkward in view of § 1357(g)(10), which explicitly carves out certain immigration activities by state and local officials as *not* requiring a written agreement. But, the majority opinion reasons that since state officials cannot themselves *remove* illegal aliens, the natural reading of § 1357(g)(10) is that state officials cannot *act at all* in immigration enforcement matters, absent an explicit written agreement, unless:

1. They are "called upon" by the Attorney General; OR

2. There is a "necessity"; AND

3. Such cooperation is "incidental," rather than "systematic and routine."

Maj. Op. at 4820-21. I concede the majority's insertion of the quoted terms into § 1357(g)(10) is quite original, which perhaps explains why no legal basis is cited for any of it. Neither does the majority opinion give us any clue from statute, regulations, or case authority as to the genesis of the key conditioning phrases "calls upon," "necessity," "routine," or "systematic," which—in their opinion—*would* legitimate agreement-less state intervention. Needless to say, anyone who actually reads § 1357(g)(10) will observe that none of the quoted words appear in *that* statute, nor indeed in any part of the Immigration and Naturalization Act ("INA").[9] 8 U.S.C.

---

[9]We strive to read Congress's enactments in a reasonable manner. *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."). Is the majority's reading of § 1357(g)(10) reasonable? Imagine, for a moment, its implementation. Morning dawns at the Pima County (Tucson) Sheriff's Office. The watch commander assembles the deputies: "Officers, in your patrols and arrests today, please remember the Ninth Circuit has told us that if you encounter aliens you suspect are illegally present in this country, you may check their immigration status with federal immigration officers, and cooperate with federal agents in their identification, apprehension, detention and removal, but only (1) if called upon by the federal authorities to assist, or (2) absent such request, where necessary, but (3) then only on an incidental basis, and (4) not in a routine or systematic basis." Officer Smith responds: "Commander, does that mean that, unless asked by the federal officers, we cannot determine immigration status of suspected illegal aliens from federal immigration officers or cooperate to help in their removal in each case in which we have reasonable suspicion, but, on the other hand, that we can do so when necessary, but then only once in a while? When will it be 'necessary'? Second, for every ten suspicious persons we run across, in how many

§ 1101 et seq. Alas, the majority opinion does not point us where to look.[10]

To determine Congress's intent, we must attempt to read and interpret Congress's statutes on similar topics together. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law." (internal quotations omitted)). In light of this, I submit that a more natural reading of § 1357(g)(10), together with § 1373(c), leads to a conclusion

cases are we allowed to request immigration checks and cooperate with the federal authorities without our immigration checks becoming 'systematic' and 'routine,' rather than merely 'incidental'?"

Rather than explain the content of the conditions which it invents— "called upon," "necessity," "systematic," and "routine"—the majority turns up its nose at a scenario made all-too-probable by its vague limitations; limitations themselves bereft of structure for lack of citation of authority. As in the case of its refusal to refute its traducing of statutory language (see footnote 5, *supra*). the majority declaims the impropriety of my criticisms, rather than discuss why they are wrong. But that does not shed any light on the question likely to be asked by the Sheriff's Deputy: "When *can* I detain a suspect to check his immigration status?"

[10]The majority contends its interpretation of § 1357(g)(10) is supported by 8 U.S.C. § 1103(a)(10). Section 1103(a)(10) empowers the Attorney General, in the event of a mass influx of aliens, to authorize state and local officers "to perform or exercise *any* of the powers, privileges, or duties" of a federal immigration officer. 8 U.S.C. § 1103(a)(10) (emphasis added). That the Attorney General may designate state officers to exercise the *full* scope of federal immigration authority in such emergency situations—*alone* and not in cooperation with federal immigration officials— does not affect or limit state officers' otherwise inherent authority under *non-emergency* circumstances "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of [illegal] aliens," 8 U.S.C. § 1357(g)(10)(B), especially by seeking immigration status information which federal authorities are obligated to provide, 8 U.S.C. § 1373(c). Nothing in the text of § 1357(g)(10), nor of § 1373(c), requires a prior "mass influx of aliens" to allow state officers to act. No case authority is cited for this peculiar instance of statutory interpretation.

4868          UNITED STATES v. STATE OF ARIZONA

that Congress's intent was to provide an important role for state officers in the enforcement of immigration laws, especially as to the *identification* of illegal aliens.

Unless the state officers are subject to a written agreement described in § 1357(g)(1)-(9), which would otherwise control their actions, the state officers are independently authorized by Congressional statute "to communicate with the Attorney General regarding the immigration status of any individual." 8 U.S.C. § 1357(g)(10)(A). Moreover, state officers are authorized "to cooperate with the Attorney General in the *identification*, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B) (emphasis added).[11] Of course, the majority is correct that state officers cannot themselves *remove* illegal aliens from the United States. The majority would read that inability as evidence of congressional intent that state officers cannot act at all with respect to other aspects of immigration enforcement that lead to removal, save on the orders of federal officers pursuant to the provisions of written agreements as set forth in 1357(g)(1)-(9). Maj. Op. at 4820. Were that so, § 1357(g)(10) would be redundant and a dead letter, save for the vague and uncertain powers which the majority limits by its newly-crafted terms "calls upon," "necessity," "systematic" and "routine." We must interpret statutes in a manner to give each part of the statute meaning, if at all reasonable. *See, e.g.*, *U.S. v. Lopez*, 514 U.S. 549, 589 (1995) ("An interpretation of [the Commerce Clause] that makes the rest of [Article I,] § 8 superfluous simply cannot be correct."); *see also Williams v. Thude*, 188 P.2d 1349, 1351 (Ariz. 1997) ("Each word, phrase, clause, and sentence [of a statute] must be given

---

[11]It is ironic that while construing Section 2(B) so as to make the second sentence thereof an independent mandate to run immigration checks on all arrestees, the majority does not apply the same canon to make § 1357(g)(10) independent, especially since § 1357(g)(10) begins with the classic language of a stand-alone, independent provision: "Nothing in this subsection shall be construed to require an agreement . . . ."

meaning so that no part will be void, inert, *redundant*, or trivial." (internal quotation marks omitted, alteration and emphasis in original)).

Further, "the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). Section 1357(g)(10) need not be interpreted at all—its plain language states that "Nothing in this subsection [8 U.S.C. § 1357(g)] shall be construed to require an agreement under this subsection in order for any officer . . . to communicate with the Attorney General regarding the immigration status of any individual." There is no need to place restrictions on this meaning, through terms such as "calls upon," "necessity," "systematic," and "routine," because the statute's meaning is clear and includes no such limitations.

I agree with the majority that "we must determine how the many provisions of [the] vastly complex [INA] function together." Maj. Op. at 4823. However, the majority opinion's interpretation of § 1357(g)(10), which requires the Attorney General to "call upon" state officers in the absence of "necessity" for state officers to have any immigration authority, makes § 1373(c) a dead letter. Congress would have little need to obligate federal authorities to respond to state immigration status requests if it is those very same federal officials who must call upon state officers to identify illegal aliens. Further, there is no authority for the majority's assertion that § 1357(g) establishes the "boundaries" within which state cooperation pursuant to § 1373(c) must occur. Maj. Op. at 4822-23. Indeed, "communicat[ions] with the Attorney General regarding the immigration status of any individual" were explicitly excluded from § 1357(g)'s requirement of an agreement with the Attorney General. 8 U.S.C. § 1357(g)(10)(A). Congress intended the free flow of immigration status infor-

4870          UNITED STATES v.  STATE OF ARIZONA

mation to continue despite the passage of § 1357(g), and so provided in subsection (g)(10). The majority's interpretation turns § 1357(g)(10) and § 1373(c) into: "Don't call us, we'll call you," when what Congress enacted was "When the state and local officers ask, give them the information."

The majority's attempt to straight-jacket local and state inquiries as to immigration status to what "terms" the "federal government" dictates reveals the fundamental divide in our views. The majority finds the intent of "the government" decisive; I look to Congress's intent—as required by Supreme Court preemption law.

Further, to "cooperate" means, I submit, "to act or operate jointly, with another or others, to the same end; to work or labor with mutual efforts to promote the same object." *Webster's New Twentieth Century Dictionary of the English Language Unabridged* (Jean L. McKechnie ed., 1979). It does not mean that each person cooperating need be capable of doing all portions of the common task by himself. We often speak of a prosecution's "cooperating witness," but it doesn't occur to anyone that the witness himself cannot be "cooperating" unless he is able to prosecute and convict the defendant himself. Hence, the inability of a state police officer to "remove" an alien from the United States does not imply the officer is unable to cooperate with the federal authorities to achieve the alien's removal.

The provision of authority whereby the Attorney General may "deputize" state police officers allows the Attorney General to define the scope and duration of the state officers' authority, as well as "direct[ ] and supervis[e]" the state officers in performing immigration functions. 8 U.S.C. § 1357(g)(1)-(9). However, this is merely *one of two forms* of state participation in federal immigration enforcement provided for by Congress in § 1357(g). Congress provided for *another* form of state participation, for which no agreement is required—states are free "to communicate with the Attorney

General regarding the immigration status of any individual," *id.* § 1357(g)(10)(A), and are also free "otherwise [than by communication] to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," *id.* § 1357(g)(10)(B).

This conclusion is confirmed by a close comparison of the language in each part of § 1357(g). As to the authority of the Attorney General to enter explicit written agreements, these agreements are limited to deputizing state officers to perform immigration-related functions "in relation to the investigation, apprehension, or detention of aliens in the United States." *Id.* § 1357(g)(1). Notably absent from this list of functions is the "identification" of illegal aliens. However, Congress recognized state officers' authority even in the absence of a written agreement with federal authorities both "to communicate with the Attorney General regarding the immigration status of any individual" and "to cooperate with the Attorney General in the *identification* . . . of aliens not lawfully present in the United States." *Id.* § 1357(g)(10) (emphasis added). "We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). The exclusion of illegal alien identification from the restraints of explicit written agreements under § 1357(g)(1)-(9), and the inclusion of this identification function in the state's unrestrained rights under § 1357(g)(10), leads to the conclusion that Congress intended that state officers be free to inquire of the federal officers into the immigration status of any person, without any direction or supervision of such federal officers—and the federal officers "*shall* respond" to any such inquiry. 8 U.S.C. § 1373(c) (emphasis added).

Another limitation of authority inferred by the majority from § 1357(g)(10) seems to be that state authorities cannot order their officers to enforce immigration laws in every case

where they have reasonable suspicion to believe the laws are being violated. The argument seems to be that while "incidental" investigation—motivated solely by the individual officer's discretion—might be permissible and not an invasion of federal immigration turf, any systematic and mandatory order to identify illegal aliens would be an incursion into a preempted area. *See* Maj. Op. at 4020-21; *see also* Oral Argument at 46:15-46:35 ("[T]he mandatory application [of Section 2(B)] is impermissible, because it takes away the discretion of the local law enforcement officer to decide whether to pursue a particular line of inquiry rather than mandated."). This reading of the statute is as original, and therefore, problematic as is utilizing the words "calls upon," "necessity," "systematic," and "routine" to circumscribe an otherwise clear statute. First, by what authority can the federal government tell a state government what orders it is to give state police officers as to the intensity with which they should investigate breaches of federal immigration law? Other than pursuant to the provisions of written agreements, 8 U.S.C. § 1357(g)(1)-(9), I see no statutory basis for allowing the federal government to limit the effort the state can command of its officers. Rather, Congress intended the Attorney General to cooperate with state officers, 8 U.S.C. § 1357(g), and commanded him to answer their requests for immigration status checks, 8 U.S.C. § 1373(c). Second, how practical is it for a watch commander to instruct his deputies that it is up to their whims as to when they can enforce federal immigration law?

## C. *Section 2(B)'s limited scope*

Next, the majority seems to believe that when a state officer (1) initiates the identification of an illegal alien by checking the alien's immigration status with federal officials pursuant to § 1373(c), and (2) has the alien identified to him by federal authorities, the state officer has somehow *usurped* the federal role of immigration enforcement. Maj. Op. at 4821-22. Section 2(B)'s scope, however, is not so expansive. Section 2(B) does not purport to authorize Arizona officers to

remove illegal aliens from the United States—Section 2(B) merely requires Arizona officers to inquire into the immigration status of suspected illegal aliens during an otherwise lawful encounter. *See* Section 2(B). Section 2(B) does not govern any other action taken by Arizona officers once they discover an alien is illegally present in the United States. Further, Section 2(B) does not require that ICE accept custody or initiate removal of the illegal alien from the United States. Federal authorities are merely obligated to respond to the immigration status inquiry pursuant to § 1373(c). Once this occurs, federal authorities are free to refuse additional cooperation offered by the state officers, and frankly to state their lack of interest in removing the illegal alien. The federal authorities can stop the illegal alien removal process at any point after responding to the state immigration status request.[12]

Although it is true that Section 2(B) requires Arizona officers to detain an arrestee suspected of being an illegal alien before releasing the alien, this does little to broaden Section 2(B)'s scope. First, because this is a facial challenge, we must assume that Arizona police officers will comply with federal law and the Constitution in executing Section 2(B). Second, Arizona has built a safeguard into Section 2 which requires that Section 2(B)'s immigration status checking mechanisms be executed in a manner consistent with federal law. *See* Section 2(L) ("This section shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens."). Finally, it would be absurd to assume that Congress would permit states to

---

[12]Of course, were the federal authorities to do just that—turn away the cooperation of state officials—they might be subject to criticism for not enforcing federal immigration law by failing to remove identified illegal aliens. Worse, since police departments tend to keep pesky records of communications, the exact amount of refusals of state assistance, and the future consequences of failing to remove illegal aliens, might make it into the Press, with perhaps embarrassing or impolitic results. These considerations, of course, should not affect the preemption analysis.

4874     UNITED STATES v. STATE OF ARIZONA

check a person's immigration status, *see* 8 U.S.C. § 1373(c), but would not allow the state to hold the suspected illegal alien until a response were received.

The majority also finds that state officers reporting illegal aliens to federal officers, Arizona would interfere with ICE's "priorities and strategies." Maj. Op. at 4824. It is only by speaking in such important-sounding abstractions—"priorities and strategies"—that such an argument can be made palatable to the unquestioning. How can simply informing federal authorities of the presence of an illegal alien, which represents the full extent of Section 2(B)'s limited scope of state-federal interaction, possibly interfere with federal priorities and strategies—unless such priorities and strategies are to avoid learning of the presence of illegal aliens? What would we say to a fire station which told its community not to report fires because such information would interfere with the fire station's "priorities and strategies" for detecting and extinguishing fires?

The internal policies of ICE do not and cannot change this result. The power to preempt lies with Congress, not with the Executive; as such, an agency such as ICE can preempt state law only when such power has been delegated to it by Congress. *See North Dakota v. United States*, 495 U.S. 423, 442 (1990) ("It is Congress—not the [Department of Defense]— that has the power to pre-empt otherwise valid state laws . . . ."). Otherwise, evolving changes in federal "priorities and strategies" from year to year and from administration to administration would have the power to preempt state law, despite there being no new Congressional action. Courts would be required to analyze statutes anew to determine whether they conflict with the newest Executive policy. Although Congress *did* grant some discretion to the Attorney General in entering into agreements pursuant to § 1357(g), Congress explicitly withheld any discretion as to immigration status inquiries by "obligat[ing]" the federal government to respond to state and local inquiries pursuant to § 1373(c) and

by excepting communication regarding immigration status from the scope of the explicit written agreements created pursuant to § 1357(g)(10). Congress's statutes provide for calls and order the calls be returned.

### D.    Supreme Court preemption cases

The Supreme Court's decisions in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341 (2001), are in accord with the view that Section 2(B) is not preempted by federal law. As the majority points out, in each of those cases, the Supreme Court concluded that Congress intended to provide the Executive with flexibility when it enacted federal law, and that state law encroached on that flexibility. That is not the situation we face here. The majority errs by reading the flexibility Congress provided to the Attorney General in entering agreements pursuant to § 1357(g) as providing universal flexibility as to all immigration matters. Congress did just the opposite. As discussed above, Congress explicitly withheld administrative discretion and flexibility as to responses to state officers' immigration status inquiries in both § 1373(c) and § 1357(g)(10). Federal authorities have no discretion whether they may respond to immigration status inquiries from state officials. 8 U.S.C. § 1373(c). State officials need not enter into a written agreement to communicate with the Attorney General regarding the immigration status of any individual. 8 U.S.C. § 1357(g)(10). Section 2(B) does not encroach on federal flexibility because Congress did not intend federal authorities to have any flexibility in providing states with properly requested immigration status information.

Neither does the Supreme Court's preemption jurisprudence in the field of foreign relations change the conclusion that Section 2(B) is not preempted. In *Crosby*, Massachusetts passed a law which restricted state entities from buying goods or services from those doing business with Burma. 530 U.S. at 366-68. Three months later, Congress passed a statute

imposing a set of mandatory and conditional sanctions on Burma. *Id.* at 368. The Court found that the Massachusetts law conflicted with several identified Congressional objectives. "First, Congress clearly intended the federal Act to provide the President with flexible and effective authority over economic sanctions against Burma." *Id.* at 374. Second, "Congress manifestly intended to limit economic pressure against the Burmese Government to a specific range." *Id.* at 377. "Finally, . . . the President's intended authority to speak for the United States among the world's nations in developing a 'comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma.' " *Id.* at 380. Thus, the Court concluded:

> Because the state Act's provisions conflict with Congress's specific delegation to the President of flexible discretion, with limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy under the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause.

*Id.* at 388.

In *American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003), President Clinton entered into an agreement with the German Chancellor in which Germany agreed to establish a foundation to compensate victims of German National Socialist companies. *Id.* at 405. In exchange, the U.S. government agreed to discourage Holocaust-era claims in American courts and encourage state and local governments to respect the foundation as the exclusive mechanism for resolving these claims. *Id.* at 405-06. Meanwhile, California passed legislation which required insurance companies doing business in the state to disclose the details of insurance policies issued to people in Europe between 1920 and 1945. *Id.* at 409. The Court explained that "even . . . the likelihood that state legis-

lation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law." *Id.* at 420. The Court held California's law was preempted: "[T]he evidence here is 'more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives.' " *Id.* at 427 (quoting *Crosby*, 530 U.S. at 386). That is, California's law conflicted with *specific* foreign-relations objectives of the Executive, as "addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century." *Id.* at 421.

Thus, as *Crosby* and *Garamendi* demonstrate, it is not simply *any effect* on foreign relations generally which leads to preemption, as the majority asserts. *See* Maj. Op. at 4825-28. Instead, a state law is preempted because it conflicts with federal law only when the state law's effect on foreign relations conflicts with federally *established* foreign relations goals. In *Crosby*, the state law conflicted with the degree of trade Congress decided to allow with Burma, and the discretion explicitly given to the Executive to make trade decisions. In *Garamendi*, the state law imposed an investigatory and litigation burden inconsistent with the rules the Executive Agreement had created. Here, however, there is *no established* foreign relations policy goal with which Section 2(B) may be claimed to conflict. The majority contends that Section 2(B) "thwarts the Executive's ability to singularly manage the spillover effects of the nation's immigration laws on foreign affairs." Maj. Op. at 4828.

First, the majority fails to identify a federal foreign relation policy which establishes the United States must avoid "spillover effects," if that term is meant to describe displeasure by foreign countries with the United States' immigration policies. The majority would have us believe that Congress has provided the Executive with the power to veto any state law which happens to have some effect on foreign relations, as if Congress had not weighed that possible effect in enacting

laws permitting state intervention in the immigration field. To the contrary, here Congress *has* established—through its enactment of statutes such as 8 U.S.C. §§ 1357(g)(10), 1373(c), and 1644—a policy which encourages the free flow of immigration status information between federal and local governments. Arizona's law embraces and furthers this federal policy; any negative effect on foreign relations caused by the free flow of immigration status information between Arizona and federal officials is due not to Arizona's law, but to the laws of Congress. Second, the Executive's desire to appease foreign governments' complaints cannot override Congressionally-mandated provisions—as to the free flow of immigration status information between states and federal authorities—on grounds of a claimed effect on foreign relations any more than could such a foreign relations claim override Congressional statues for (1) who qualifies to acquire residency in the United States, 8 U.S.C. § 1154, or (2) who qualifies to become a United States citizen, 8 U.S.C. § 1421 et seq.

Finally, the majority errs in finding that the threat of all 50 states layering their own immigration rules on top of federal law weighs in favor of preemption. In *Buckman*, the Supreme Court stated: "As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants *burdens not contemplated by Congress in enacting the FDCA and the MDA*." 531 U.S. at 350 (emphasis added). I fail to see how Congress could have failed to contemplate that states would make use of the very statutory framework that Congress itself enacted. Congress created the Law Enforcement Support Center "to provide alien status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis." Congress also obligated ICE to respond to all immigration status inquiries from state and local authorities. 8 U.S.C. § 1373(c). In light of this, all 50 states enacting laws for inquiring into

the immigration status of suspected illegal aliens is *desired* by Congress, and weighs against preemption.

### *Conclusion*

As demonstrated above, Congress envisioned, intended, and encouraged inter-governmental cooperation between state and federal agencies, at least as to information regarding a person's immigration status, for the proper and efficient enforcement of federal immigration law. While § 1357(g)(1)-(9) grants the Attorney General discretion to enter into written agreements deputizing and supervising state officers, § 1357(g)(10) explicitly recognizes an alternative to that regime, so as to encourage and facilitate the free flow of immigration status information provided for in § 1373(c). The majority's arguments regarding how any of the state officers' actions spelled out in Section 2(B) could interfere with federal immigration enforcement is consistent with only one premise: the complaining federal authorities do not *want* to enforce the immigration laws regarding the presence of illegal aliens, and do not *want* any help from the state of Arizona that would pressure federal officers to have to enforce those immigration laws. With respect, regardless what may be the intent of the Executive, I cannot accept this premise as accurately expressing the intent of Congress.

### II.    *Sections 3 and 5(C)*

I concur with the majority that Section 3, which penalizes an alien's failure to carry documentation as required by federal immigration statutes, impermissibly infringes on the federal government's uniform, integrated, and comprehensive system of registration which leaves no room for its enforcement by the state. I also concur with the majority that Section 5(C), which penalizes an illegal alien for working or seeking work, conflicts with Congress's intent to focus on employer penalties, an intent determined by this court in *National Center for Immigrants' Rights, Inc. v. I.N.S.*, 913 F.2d 1350 (9th

Cir. 1990), *rev'd on other grounds*, 502 U.S. 183 (1991). As a three-judge panel, we may not re-examine the conclusions reached in *National Center*. *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc); *see also Newdow v. Lefevre*, 598 F.3d 638, 644 (9th Cir. 2010) (holding that Establishment Clause challenge to the placement of "In God We Trust" on coins and currency was foreclosed by *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970)).

However, for the reasons discussed above as to Section 2, I disagree with the majority's foreign-relations rationale. The majority fails to identify a foreign relations policy, established by Congress, with which Sections 3 and 5 conflict; a foreign nation may not cause a state law to be preempted simply by complaining about the law's effects on foreign relations generally. We do not grant other nations' foreign ministries a "heckler's veto."

## III.   Section 6

The majority's analysis of S.B. 1070 Section 6[13] will come as a surprise to all parties involved in this case. It ignores the contentions in the filings before the district court, the district court's rationale, the briefs filed in this court, and what was said by the well-prepared counsel, questioned at our oral argument. Indeed, it is an argument and conclusion volunteered by the majority, but carefully avoided by the United States— probably because it conflicts with the present policy of the Department of Justice's Office of Legal Counsel. First, let us examine what I thought the parties put before us for decision.

The *only* contention made by the United States in this liti-

---

[13]S.B. 1070 Section 6 provides that "[a] peace officer, without a warrant, may arrest a person if the officer has probable cause to believe . . . [t]he person to be arrested has committed any public offense that makes the person removable from the United States." Ariz. Rev. Stat. Ann. § 13-3883(A)(5) (2010).

gation with respect to Section 6 is that, due to the complexity inherent in determining whether a specific crime makes an alien removable, Arizona police officers will ineluctably burden legal aliens through erroneous warrantless arrests. Not a very strong contention at that, since counsel for the United States all but conceded this argument's flaw as to this facial challenge at oral argument by admitting that Arizona police officers could very easily determine that some crimes, such as murder, would make an alien removable. Thus, the analysis of this section should have been simple—Section 6 was facially constitutional because a "set of circumstances" existed under which no "complexity" existed: an Arizona police officer comes across an alien convicted of murder; he is removable; he can be lawfully arrested. *See Salerno*, 481 U.S. at 745. So, Section 6 was not preempted. End of story.

Instead, the majority misrepresents Arizona's attempt to assist the federal government as "unilaterally transform[ing] state and local law enforcement officers into a state-controlled DHS force to carry out its declared policy of attrition." Maj. Op. at 4842. Section 6 is not, and could not, be so broad. Instead, Section 6 merely authorizes Arizona police officers to make warrantless arrests when they cooperate in the enforcement of federal immigration law—as invited to do by Congress. *See* 8 U.S.C. § 1357(g)(10).

For its newly-minted-but-not-argued position, the majority relies extensively on 8 U.S.C. § 1252c—a code section not cited in support by the United States[14]—misinterpreting its meaning and putting this circuit in direct conflict with the Tenth Circuit. The majority also ignores clear Supreme Court precedent and concludes that 8 U.S.C. § 1357(a)'s limitations as to *federal* warrantless arrest power implies a limitation on

---

[14]Indeed, the total treatment of § 1252c in the briefs consists of a one-sentence citation in Arizona's brief arguing *against* Section 6's preemption, and the United States' citation, without argument, in a string cite in its statement of facts.

state officers. As I discuss below, the majority erred in concluding that state police officers have no authority to enforce the civil provisions of federal immigration law.

As noted by the majority opinion, Section 6 applies to three different scenarios: (1) when there is probable cause to believe a person committed a removable offense in a state other than Arizona; (2) when there is probable cause to believe that an individual committed a removable offense in Arizona, served his or her time for the crime, and was released; and (3) when there is probable cause to believe an individual committed a removable offense, but was not prosecuted. The question before us is whether warrantless arrests by state police officers in these three scenarios conflict with Congress's intent.

### A.   Inherent authority of state officers to enforce federal immigration law

As an initial matter, it is notable that the United States never once asserted, either at oral argument or in its briefs, that Arizona officers are without the power to enforce the civil provisions of immigration law. Indeed, counsel for the United States at oral argument actually *confirmed* state officers' authority to arrest aliens on the basis of civil removability. *See* Oral Argument at 58:40-59:40 (stating that Section 6 would be constitutional if it required Arizona officers to contact ICE regarding whether a crime renders an alien removable).[15] The United States' argument against Section 6's

---

[15]Actual text from oral argument:

DEPUTY SOLICITOR GENERAL KNEEDLER: No, I think [Section 6] continues to present the problems that the [District] Court identified because there's no requirement in Section 6 that the state or local officer contact ICE in order to find whether an offense is removable. The individual with, the officer would have to make a judgment as to whether the public offense in the other state was also a public offense in Arizona, and then determine whether it would in turn lead to a removal—

constitutionality was limited to the "burden" that would be imposed on *wrongfully* arrested legal aliens due to the complexity of determining whether a certain crime makes an alien eligible for removal. Indeed, as the 2002 Department of Justice's Office of Legal Counsel Opinion ("2002 OLC Opinion") concludes, "the authority to arrest for violation of federal law inheres in the state, subject only to preemption by federal law." *See also Marsh v. United States*, 29 F.2d 172 (2d Cir. 1928) ("[I]t would be unreasonable to suppose that [the United States'] purpose was to deny to itself any help that the states may allow.").[16]

The majority rejects the existence of this inherent state authority by citing one case from this court in which we "assumed" states lacked such authority. In *Gonzales v. City of Peoria*, this court held state police officers could enforce

---

JUDGE NOONAN: But the response is like Judge Paez suggested earlier, second-degree murder is the crime.

DEPUTY SOLICITOR GENERAL KNEEDLER: *Well, in some, in that situation, it would probably, you know, it would probably be possible to make that determination.*

JUDGE NOONAN: Then why, so it doesn't, you have a *Salerno* problem with respect to Section 6?

DEPUTY SOLICITOR GENERAL KNEEDLER: Well, I don't think so because there's no requirement to check with ICE, first of all, and the INA, that's that responsibility for making removability determinations in the Federal Government. *There may be some situations in which something could be done otherwise.*

(emphases added).

[16]The United States likely did not adopt the majority's § 1252c argument because the Department of Justice is required to comply with Opinions from the Office of Legal Counsel. Congressional Research Service, Authority of State and Local Police to Enforce Federal Immigration Law, Sept. 17, 2010, *available at* http://www.ilw.com/immigrationdaily/news/2010,1104-crs.pdf ("[Office of Legal Counsel] opinions are generally viewed as providing binding interpretive guidance for executive agencies and reflecting the legal position of the executive branch . . . .").

4884          UNITED STATES V. STATE OF ARIZONA

criminal provisions of the INA. 722 F.2d 468, 475 (9th Cir. 1983), *rev'd on other grounds*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc). During its analysis, this court stated in dicta:

> We *assume* that the civil provisions of the Act regulating authorized entry, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration. *However, this case does not concern that broad scheme*, but only a narrow and distinct element of it—the regulation of criminal immigration activity by aliens.

*Id.* at 474-75 (emphasis added). The majority erred in simply accepting *Gonzales*'s assumption, in dicta, without performing any additional inquiry into whether it was indeed correct.[17]

The majority also missteps in relying on an abbreviated analysis in *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008). There, Urrieta moved to suppress items found in his car during an extended search by local police. *Id.* 572-73. Urrieta had been detained by a local police officer following

---

[17]*Gonzales'* dicta is not binding on this panel. In *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc), this court stated:

> Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.

*Id.* at 915. Here, the *Gonzales* panel's statement regarding the civil provisions was "made casually and without analysis"; indeed, the panel even admitted they "assume[d]" the conclusion. It takes no analysis to assume. Further, the statement on INA's civil provisions was "merely a prelude to another legal issue." Immediately after making the statement, the panel noted that the "case d[id] not concern" the civil provisions. Therefore, this panel is not bound by the *Gonzales* court's assumption, in dicta, regarding the INA's civil provisions.

the issuance of a traffic citation. *Id.* at 571-72. During the detention related to the traffic violation, the police officer attempted to determine whether Urrieta was an illegal alien. *Id.* The court concluded that suspicion of Urrieta's illegal presence was insufficient to extend Urrieta's detention. *Id.* at 574. In doing so, the court characterized 8 U.S.C. § 1357(g) as "stating that local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions that are not applicable in the present case." *Id.*

This conclusion, however, completely ignored the existence and effect of § 1357(g)(10). As discussed fully throughout this dissent, subsection (g)(10) envisions state cooperation in the enforcement of federal immigration law outside the context of a specific agreement with the Attorney General by "identification, apprehension, detention, or removal" in cooperation with federal immigration authorities. Further, § 1357(g)(10) makes no distinction between criminal and civil provisions—indeed, it refers to "aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). The Sixth Circuit's truncated conclusion may be based on the fact that the government withdrew the argument that Urrieta's extended detention was justified on suspicion that he was an "undocumented immigrant" as "misstat[ing] the law." *Id.* Thus, the majority should not have relied on the Sixth Circuit's language in concluding that state officers lack inherent authority to enforce the civil provisions of immigration law any more than it should have relied on the language in *Gonzales*, and for the same reason: the issue whether a state officer had inherent authority to arrest a person for violation of a federal civil violation was simply not before either court.

Moreover, the majority ignores clear Supreme Court precedent in concluding that state officers cannot make warrantless arrests because federal immigration officers cannot make warrantless arrests under the same circumstances pursuant to 8

4886          UNITED STATES v. STATE OF ARIZONA

U.S.C. § 1357(a). Maj. Op. at 4842. In *United States v. Di Re*, 332 U.S. 581 (1948), state officers arrested Di Re for knowingly possessing counterfeit gasoline ration coupons in violation of § 301 of the Second War Powers Act of 1942, a federal law. *Id.* at 582. Di Re challenged the search incident to the arrest. *Id.* The Supreme Court upheld the arrest, stating "that in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." *Id.* at 589; *accord Miller v. United States*, 357 U.S. 301, 305 (1958) (holding that when state peace officers arrest a person for violation of federal narcotics law, "the lawfulness of the arrest without warrant is to be determined by reference to state law"); *Johnson v. United States*, 333 U.S. 10, 15 n.5 (1948) (holding that when state peace officers arrest a person for violation of federal narcotics law, "[s]tate law determines the validity of arrests without warrant"). Thus, the authority of states to authorize warrantless arrests for violations of federal law is well established.[18]

The conclusion that state police officers have the inherent authority to enforce the civil provisions of federal immigration law is supported by *Mena v. City of Simi Valley*, 332 F.3d 1255 (9th Cir. 2003). There, a police officer questioned a woman about her immigration status. *Id.* at 1262. This court stated that "it [was] doubtful that the police officer had any authority to question Mena regarding her citizenship." *Id.* at 1165 n.15. The Supreme Court overruled this court and stated:

---

[18]Although it is true that the federal laws in these cases were criminal, rather than civil, the Supreme Court was careful to couch its holdings in terms of "federal laws" generally, without reference to whether such laws were criminal in nature. This court's holding in *Gonzales* that illegal presence, alone, is not a crime—recently reaffirmed by this court in *Martinez-Medina v. Holder*, ___ F.3d ___, 2011 WL 855791, at *6 (9th Cir. 2011) —is inapposite. As discussed above, the question whether state and local officers could enforce civil immigration laws was not before the court in *Gonzales*, and therefore its "distinction" between criminal and civil immigration laws is inexistent. *See* Maj. Op. at 4843-44 n.22.

As the Court of Appeals did not hold that the deten-
tion was prolonged by the questioning, there was no
additional seizure within the meaning of the Fourth
Amendment. Hence, the officers did not need rea-
sonable suspicion to ask Mena for her name, date
and place of birth, *or immigration status*.

*Muehler v. Mena*, 544 U.S. 93, 101 (2005) (emphasis added).
Thus, the Supreme Court explicitly recognized—in one of our
California cases—that state police officers have authority to
question a suspect regarding his or her immigration status,
directly contradicting the majority's conclusion that state offi-
cers possess no inherent authority to enforce the civil provi-
sions of immigration law.[19]

## B. Non-preemption of states' inherent enforcement authority

Next, the majority errs in finding that 8 U.S.C. § 1252c pre-
empts this inherent state arrest authority. Despite § 1252c's
lack of *any* language which indicates an intent to *limit* state
powers, the majority holds that § 1252c represents the *full
extent* of the arrest power Congress intended—a contention
the Tenth Circuit previously rejected. *See United States v.*

---

[19]The majority contends "*Mena* did not recognize that state officers can
enforce federal civil immigration law with no federal supervision or
involvement." Maj. Op. at 4843 n.21. It is true that an INS officer was
present when the state and local officers questioned Mena regarding her
immigration status. However, the actions of the INS officer were not
before the Court; it was the conduct of the state and local officers which
the Court scrutinized. *See Mena*, 544 U.S. at 100-01. Moreover, the
Supreme Court did not state that the presence of an INS officer was
*required* for the state and local officers to question Mena regarding her
immigration status. Indeed, the Court in *Mena* did not even mention the
presence of the INS officer in the portion of the opinion recognizing the
state and local officers' questioning was permissible. *See id.* So, the offi-
cer conduct the Court approved was the state and local officer conduct.
For aught that appears, the federal officer was a bystander, not one who
"called upon" the state officers for help. *See supra* pages 4865-69.

4888        UNITED STATES v. STATE OF ARIZONA

*Vasquez-Alvarez*, 176 F.3d 1294 (10th Cir. 1999), *cert. denied*, 528 U.S. 913 (1999); *see also United States v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001). 8 U.S.C. § 1252c provides, in relevant part:

> Notwithstanding any other provision of law, to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who—
>
> > (1) is an alien illegally present in the United States; and
> >
> > (2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction,
>
> but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.

8 U.S.C. § 1252c(a). The majority concludes that because Section 6 would allow warrantless arrests in a broader set of circumstances than described in § 1252c, it therefore conflicts with Congress's intent.

The Tenth Circuit persuasively rejected this contention over a decade ago. In *United States v. Vasquez-Alvarez*, "Vasquez claimed that 8 U.S.C. § 1252c limit[ed] the authority of state and local police officers, allowing such an officer to arrest an illegal alien only when the INS has confirmed, before the arrest, that the alien has previously been convicted

of a felony and has, since that conviction, been deported or left the United States." 176 F.3d at 1295.[20]

Unable to cite any text in § 1252c which would expressly or impliedly state an intention that § 1252c was meant to be the *only* authority for state police to arrest an alien for his unlawful presence in this country, nor any canon of statutory interpretation that would come to its aid—and ignoring a later statute's recognition of the authority to detain (1357(g)(10)) —the majority appeals to legislative history. As noted by the majority, the only legislative history as to § 1252c is the floor debate that accompanied Representative Doolittle's introduction of § 1252c. The Tenth Circuit analyzed the plain language of § 1252c as well as this legislative history, and rejected Vasquez's claim:

> This legislative history does not contain the slightest indication that Congress intended to displace any preexisting enforcement powers already in the hands of state and local officers. Accordingly, neither the text of the statute nor its legislative history support Vasquez's claim that § 1252c expressly preempts state law.

*Id.* at 1299.

The majority takes a single Representative's comment— that states lacked the authority to arrest illegal aliens and that § 1252c was needed to authorize such arrests—to conclude that Congress *as a whole* intended § 1252c to represent the limit of state arrest authority. Like the Tenth Circuit, however, I cannot conclude that Congress intended § 1252c to represent the outer bounds of state officers' authority to arrest illegal aliens based solely on the comments of one Representative. As stated by the Tenth Circuit:

---

[20]Again, Vasquez claimed that in *his* case. The United States has made *no* such claim here. *See supra* footnote 14.

> Representative Doolittle did not identify which "current Federal law" prohibited "State and local law enforcement officials from arresting and detaining criminal aliens." Neither the United States nor Vasquez has identified any such preexisting law. Furthermore, this court has not been able to identify any pre-§ 1252c limitations on the powers of state and local officers to enforce federal law.

*Id.* at 1299 n.4; *see also United States v. Anderson*, 895 F.2d 641, 647 (9th Cir. 1990) (Kozinski, J., dissenting) ("[Legislative] history . . . is seldom, if ever, even seen by most of the legislators at the time they cast their votes.").[21] Further supporting this conclusion is the text of § 1252c, which does not provide even the slightest indication that Congress intended to preempt otherwise inherent state arrest powers.

The Tenth Circuit went on to note that Congress subsequently "passed a series of provisions designed to encourage cooperation between the federal government and the states in the enforcement of federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at 1300. Notably, Congress passed 8 U.S.C. § 1357(g), discussed at length above, just five months later.[22]

---

[21]The majority contends it is hypocritical that I criticize the majority's reliance on a single representative's comments while supporting the Tenth Circuit's approach in *Vasquez-Alvarez*—which also relied on this representative's comments. To the extent the Tenth Circuit relied affirmatively on Rep. Doolittle's comments, I agree with the majority that such reliance was misguided. Nonetheless, the Tenth Circuit also noted what the legislative history *failed* to demonstrate: an intent to displace preexisting state arrest authority. *See Vasquez-Alvarez*, 176 F.3d at 1299 & n.4. Conflict preemption requires a determination that Congress's intent conflicts with the state law in question. This requires, first, determining Congress's intent. Was it Congress's intent not to remove aliens illegally present in this country? The inability to discern an incompatible intent is fatal to the United States' preemption claim.

[22]8 U.S.C. § 1644 was passed four months after § 1252c, and one month before § 1357(g). Section 1373(c) was passed at the same time as § 1357(g).

The Tenth Circuit found this code section "evince[d] a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws." *Id.* The majority states that the Tenth Circuit erred in "*interpret[ing]* § 1357(g)(10) to mean that [a] 'formal agreement [pursuant to § 1357(g)(1)-(9)] is not necessary for state and local officers "to cooperate with the Attorney General in identification, apprehension, detention, or removal of aliens." ' " Maj. Op. at 4847 (emphasis added). It is no wonder that the Tenth Circuit so "interpreted" § 1357(g)(10), when that is what the statute *explicitly* says:

> *Nothing in this subsection [1357(g)] shall be construed to require an agreement* under this subsection in order for any officer or employee of a State or political subdivision of a State . . . otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

8 U.S.C. § 1357(g)(10)(B) (emphasis added). I cannot join the majority in criticizing the Tenth Circuit for merely reading the statute's words.[23]

The majority contends that § 1357(g)(10) "neither grants, nor assumes the preexistence of, inherent state authority to enforce civil immigration laws in the absence of federal supervision." Maj. Op. at 4847. What, then, does § 1357(g)(10) do? We must read 1357(g)(10) in context of § 1357(g) as a whole. Section 1357(g) created, for the first time, the authority of the Attorney General to enter into agree-

---

[23]But I *can* criticize the majority for initiating a needless circuit split between our court and the Tenth Circuit, contrary to our own declared preference to avoid such circuit splits. *See, e.g.*, *United States v. Alexander*, 287 F.3d 811 (9th Cir. 2002) ("[A]bsent a strong reason to do so, we will not create a direct conflict with other circuits." (quoting *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987))).

ments with states and localities to deputize their officers as 287(g) immigration officers. Subsections (g)(1)-(9) set out the specifics of the explicit written agreements—state officers are paid by the state, trained by the federal government, supervised by the Attorney General, and should be treated as federal employees for purposes of liability and immunity. However, § 1357(g)(10) states clearly that this new method of state involvement—287(g) deputized officers—is not the *only* way state officers may cooperate in the enforcement of federal immigration law. Subsection (g)(10) preserves the preexisting authority of state officers to participate in enforcing immigration law, without the requirement of any formal, written agreement as envisioned by § 1357(g)(1)-(9).

Absent subsection (g)(10), one might argue that the authority created by § 1357(g)(1)-(9) to deputize state officers represents the *full* extent of state officer immigration enforcement.[24] Instead, (g)(10) makes clear that state officers' authority "otherwise to cooperate" in enforcing federal immigration law remained intact after the creation of the new "deputy track" of enforcement. This reading does not make § 1357(g) superfluous, as the majority contends. *See* Maj. Op. at 4847. Indeed, this interpretation makes each part of § 1357(g) necessary—subsections (g)(1)-(9) are necessary to authorize the Attorney General to deputize 287(g) officers, and subsection (g)(10) is necessary to preserve state officers' preexisting communication and arrest authority. The majority cannot explain how state officers may "otherwise cooperate" pursuant to § 1357(g)(10)—in such concrete areas as the "identification, apprehension, detention, [and] removal" of suspects— if they possess no inherent authority to enforce civil immigration law. The reason for this inconsistency is the majority's antecedent error—finding state officers lack such inherent authority.

---

[24]Indeed, this is what the majority does even *with* the presence of § 1357(g)(10).

Neither does this interpretation render § 1252c superfluous, as the majority contends. *See* Maj. Op. at 4847. Section 1252c's "notwithstanding" language acts as a safeguard against other provisions of *federal* law, preventing any other provision from being construed to preempt state arrest authority to arrest certain illegal aliens. As stated by the 2002 OLC Opinion:

> If, for example, a court were otherwise inclined (per the Ninth Circuit's dicta in *Gonzales*[ *v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983)]) to misconstrue the provisions of the INA as preempting state authority to arrest for civil deportability, section 1252c would operate to ensure that state police at least retained the authority to make such arrests of aliens who had previously been convicted of a felony and had been deported or had left the United States after such conviction.

2002 OLC Opinion at 11. Moreover, Congress has authority to enact legislation which is designed merely to clarify, without affecting the distribution of power. *See, e.g.*, Reaffirmation—Reference to One Nation Under God in the Pledge of Allegiance, Pub L. No. 107-293 (2002) ("An Act To *reaffirm* the reference to one Nation under God in the Pledge of Allegiance." (emphasis added)). Thus, § 1252c does not become "superfluous" merely because it does not enlarge or shrink the arrest power provided to state police officers.[25]

---

[25]The majority criticizes my use of the 2002 OLC Opinion. Maj. Op. at 4847 n.24. I agree with the majority's assertion that the OLC Opinion does not bind this court. I quote it, however, not for its authority, but to rebut the majority's contention that § 1252c is superfluous.

The majority is correct that the legislative history accompanying § 1252c does not contain reaffirming language like that found in Reaffirmation—Reference to One Nation Under God in the Pledge of Allegiance, Pub L. No. 107-293 (2002). Indeed, § 1252c's legislative history contains nothing more than the floor debate discussed previously. Again, the point of this citation is simply to demonstrate the various, non-superfluous motivations for Congressional action which do not explicitly alter the status quo.

*Conclusion*

In conclusion, Section 6 is not preempted and is constitutional. The United States all but conceded the only argument it made in this court and the court below. On the merits of the majority's *sua sponte* suggestion that state officers can act in the immigration enforcement field pursuant only to 8 U.S.C. § 1252c, familiar principles of dual sovereignty, as recognized by the Supreme Court, provide states with the inherent authority to enforce federal immigration law. In passing 8 U.S.C. § 1252c, a statement by the bill's sponsor of what *he* thought was the preexisting state of the law is insufficient to establish that Congress as a whole intended to displace this preexisting authority vested in the states. Finally, 8 U.S.C. § 1357(g)(10), enacted *after* § 1252c, explicitly recognizes an authority reserved to the states to enforce federal immigration law *outside* the confines of a written agreement with the Attorney General. Section 6 does not conflict with the intent of Congress, and thus is not conflict preempted.

## IV.  Conclusion

The majority misreads the meaning of the relevant federal statutes to ignore what is plain in the statutes—Congress intended state and local police officers to participate in the enforcement of federal immigration law. Sections 2 and 6 do not conflict with this intent, and thus are constitutional.